## LOWER MORELAND HOMEOWNER'S ASSOCIATION

v.

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT.

Civ. A. No. 78–3231.

United States District Court, E. D. Pennsylvania.

June 12, 1979.

Paul Shalita, Philadelphia, Pa., for plaintiff.

Gary Tilles, Asst. U.S. Atty., Philadelphia, Pa., Paul Jorgensen, Dept. of Housing and Urban Development (HUD), Washington, D.C., William M. Adshead, Philadelphia, Pa. (GDL Plaza Corp.), for defendant.

## OPINION

DITTER, District Judge.

This is an action brought by the plaintiff homeowner's association to prevent the Department of Housing and Urban Development (HUD) from financing a proposed senior citizen's housing project in Lower Moreland Township, Montgomery County, Pennsylvania. Jurisdiction is vested in this court by 28 U.S.C. §§ 1331 and 2201, as well as by the Administrative Procedure Act, 5 U.S.C. § 551 et seq.

Presently before me is the plaintiff's motion for a preliminary injunction restraining HUD from disbursing any funds for the use of the housing project at issue pending a final determination of this suit on its merits. After considering the evidence presented at the preliminary injunction hearing, together with the extensive briefs of counsel, I have concluded that the plaintiff's motion must be granted.

## I. STATUTORY FRAMEWORK

Ordinarily, it would be appropriate to begin an opinion of this nature with a statement of the relevant facts. To understand the facts of the present case fully, however, it will be useful to review the applicable statutes and regulations first.

Section 202 of the National Housing Act authorizes loans by the Secretary of HUD to private and public nonprofit organizations, known as sponsors, in order to assist them in constructing housing facilities for low-income elderly and handicapped families. 12 U.S.C. § 1701q(a)(1).[1]

By the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq., Congress created the Community Development Program, the purpose of which was to improve housing and related facilities for low-income residents of the nation's urban communities. Under this program, a "unit of general local government," as defined in 42 U.S.C. § 5302(a)(1), may apply for funding in the form of a Community Development Block Grant (CDBG). Such applications must be renewed on an annual basis as long as the local government unit wishes to continue its participation in the Community Development Program. An important component of the application is the Housing Assistance Plan (HAP). The purpose of the HAP is to assess housing assistance needs in the local government's area, specify an annual goal for the number of persons or dwelling units to be assisted, and indicate the general locations of proposed low-income housing facilities. 42 U.S.C. § 5304(a)(4).

In order for a HAP to be approved, it must satisfy a "proportionality requirement." HUD has divided low-income persons needing housing assistance into three "household types": (1) elderly and handicapped; (2) families and non-elderly individuals; (3) large families. The HAP must set goals for assisting the three household types in the same proportion as it identifies their respective needs. 24 C.F.R. § 570.-306(c).

Congress recognized the necessity of coordinating applications by non-profit sponsors under section 202 with the housing needs and goals identified by the relevant local government unit in its HAP. This coordination is provided by section 213 of the Housing and Community Development Act of 1974, 42 U.S.C. § 1439. Under the terms of section 213, whenever a section 202 application proposes the construction of assisted housing within an area covered by an approved HAP, the application must be sub-

---

1. Section 202 frequently operates in conjunction with section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f, whereby rent subsidies are provided to low income residents. Thus, a housing facility built with section 202 funds whose tenants receive section 8 subsidies is often referred to as a "202/8" project.

mitted by HUD to the local government unit. This procedure gives the local government an opportunity to object if the housing project proposed by the section 202 sponsor is inconsistent with the current HAP. 42 U.S.C. § 1439(a)(1). Section 213 also provides that if the local government does so object, HUD may not approve the 202 application unless it determines that the proposed project *is* consistent with the HAP. 42 U.S.C. § 1439(a)(2).

The HUD regulations promulgated under section 213 delineate the review and objection procedure in greater detail. These regulations provide that the local government's objection on the ground of inconsistency may be based on any of six criteria including the objection that the proposed location of the project is not within an area where assisted housing is needed as identified by the HAP. Specifically, 24 C.F.R. § 891.204(b)(4) says:

> The proposed location of newly constructed or substantially rehabilitated units is inconsistent with the general locations specified in the applicable HAP, and is objectionable to the local government for reasons which are specified.

The regulations further provide that if the local government unit does not object, the HUD field office director may approve the application unless he makes an independent determination that it is inconsistent with the HAP. 24 C.F.R. § 891.205(b)(1). Conversely, if the local government *does* object, the field office director must concur in the objection and disapprove the application "unless he makes an independent determination of consistency, based on substantial evidence, that the application is consistent with the applicable HAP [sic]." 24 C.F.R. § 891.205(b)(2).

Finally, regulations of the federal Office of Management and Budget (OMB) establish an additional review procedure. Under the provisions of an OMB document known as Circular A–95, HUD is required to submit all section 202 applications to both the state government and the appropriate regional planning agency within whose jurisdiction the proposed project will be built. This process is generally referred to as the "A–95 review." Unlike the section 213 procedure, the A–95 review is strictly advisory in nature.

## II. FACTS

The following narrative will constitute my findings of fact. On September 23, 1977, defendant GDL Manor Corporation (GDL) was notified that it had been conditionally selected by HUD as an approved sponsor under section 202. In response to this notice, GDL submitted an application for approval of its plan to build a section 202 elderly housing project in Southampton Township, Bucks County, Pennsylvania. On January 11, 1978, however, the Southampton Township Board of Supervisors notified HUD that it had declined to approve a necessary zoning change. In search of another location, therefore, a representative of GDL met with the Commissioners of Lower Moreland Township and proposed the construction of the section 202 project on a site in Lower Moreland at the corner of Huntingdon Pike and County Line Road. The project would consist of 111 apartment units in a four story building.

The Commissioners held two public hearings to consider a change of zoning that the project would require. A number of witnesses testified at these hearings concerning the potential effect of GDL's proposal.[2] Their testimony established that if constructed, the project could seriously and adversely alter the character of the surrounding community.

The proposed site is a 5.3 acre parcel. It is surrounded by a residential subdivision known as Justa Farm, which consists of large single-family houses situated on lots averaging one acre in size. The houses tend to have a high market value. The members of the plaintiff association are residents of Lower Moreland Township, all of whom

---

2. A transcript of the testimony given by these witnesses at the zoning hearings was included in the record of the present case. By stipulation of counsel, it was agreed that they would give the same testimony if called to testify at the preliminary injunction hearing.

own homes near or adjacent to the proposed site of the GDL project.

A traffic study of the Huntingdon Pike—County Line Road intersection was conducted by John Comiskey, a registered traffic engineer and a qualified expert, who testified at the hearings. As the following table indicates, the study concluded that *present* traffic at peak hours exceeds the design capacity of the intersection in all directions:

PRESENT USAGE

| Approach | Percent of Design Capacity |
|---|---|
| County Line from the West | 142% |
| Huntingdon Pike from the North (left turn lane) | 146% |
| Huntingdon Pike from the North (straight through and right turn) | 106% |
| Huntingdon Pike from the South | 113% |
| County Line from the East | 108% |

The proposed GDL project would add an estimated 280 vehicle trips through the intersection per day, approximately ten percent of which would occur at peak hours. Moreover, the elderly residents of the 111 apartments could be expected to increase pedestrian volume substantially, particularly since a shopping center is located diagonally across the intersection. It is likely that a pedestrian cycle would have to be added to the traffic signal, increasing the present 58 second total cycle to 77 seconds. The result of this change would be to reduce the green light time for each direction, increase the waiting time, and conceivably double the actual traffic congestion at certain points. Residents have observed that some drivers seek to avoid the intersection, with its present volume of traffic, by detouring through adjacent residential streets. This phenomenon will be compounded by construction of the GDL project.

In addition to causing traffic problems, the proposed project will adversely affect the community in other ways. GDL plans to pay Lower Moreland Township $20,000. per year in lieu of annual property taxes. This equals approximately $180. per unit. Uncontradicted testimony established, however, that each unit would require municipal services costing an average of $306. per year. The presence of the senior citizen facility will also place increased burdens on the Township's police and fire departments.

Aesthetically, the project will be significantly out of character with the surrounding neighborhood. The proposal calls for a four story, multi-unit apartment building in an area presently dominated by single-family homes. Moreover, the project will place an added strain on the Township's already inadequate sewer system.

■ Finally, GDL has offered no plans for feasible, alternative uses of the building in the event the project should fail economically. Thus, while it is only speculation, the Township residents face the potential of being left with a vacant and untended apartment building in the midst of their community.[3]

---

**3.** Plaintiffs have suggested that the community will also be injured by the political impact of the GDL project. Their theory here is that the addition of 111 elderly households to a township with only 4500 registered voters will greatly increase the political power and influence of senior citizens as an interest group in Lower Moreland. Plaintiffs predict that the result will be organized and effective opposition to improvements in public education as well as other public facilities in which elderly persons have no interest. I firmly reject this argument as a basis for granting a preliminary injunction. First, the evidence does not support plaintiffs' position. The residents of the proposed project will not be paying direct taxes. Moreover, the annual allotment which GDL would pay to the township is fixed and will not increase with the demands of inflation on the costs of government. Thus, while the elderly in general may have no interest in public facilities such as schools, the residents of this project would also have no interest in opposing public expenditures for such items. Second, in my opinion, it would be patently unconstitutional for a court of law to rely on the theory advanced here. Essentially, plaintiffs are saying that they wish to exclude a particular group of people from their community because of the way those people are likely to vote. The constitutional infirmity of such an argument would be clear if the proposed housing project was to be inhabited primarily by members of a racial minority. The same constitutional principles demand rejection of this theory when it is applied to senior citizens.

Nevertheless, despite the clamor of these objections, the Lower Moreland commissioners approved the necessary zoning change. This, however, was not enough to permit final approval of the GDL project by HUD. As noted earlier, section 213 of the Housing and Community Development Act of 1974, 42 U.S.C. § 1439, requires that HUD must submit all applications for section 202 funding to . "the unit of general local government" if the latter has "an approved housing assistance plan." (HAP). The parties are agreed that in this case the term "unit of general local government" refers solely to Montgomery County, and not to Lower Moreland Township.[4] The County has participated in the Community Development Program since 1975, and its current 1977 HAP had already been approved by HUD at the time that GDL submitted its 202 application. Therefore, the County was entitled to the opportunity for review and objection mandated by section 213.

Even before receiving formal notification from HUD, however, the County learned of the GDL proposal from Lower Moreland officials. Through its planning commission (MCPC), the County determined that the project was objectionable because its proposed location was inconsistent with the County's HAP. Lower Moreland Township was not within an area identified by the HAP as needing new elderly housing facilities. Two senior citizen housing projects were already operating within the Township, and the surrounding area had a below average number of elderly residents. At the same time, other parts of the county had far greater numbers of elderly persons in need of housing.

The MCPC was particularly concerned about the proportionality requirement established in 24 C.F.R. § 570.306(c). As explained earlier, this regulation requires that housing assistance must be provided in accordance with the proportionate needs of three "household types": elderly-handi-

capped, family-individual, and large family. The County feared that if the GDL project, with its 111 elderly units, was built in Lower Moreland, future resources would have to be devoted to building family and large family facilities, in order to maintain the proportionate balance. As a result, elderly housing projects could not be constructed in other parts of the county where they were seriously needed.

On May 26, 1978, HUD formally notified Montgomery County of the GDL application, thereby providing the County with its opportunity for review under section 213. The County responded on June 27, 1978, by registering a formal objection to the project on the ground of locational inconsistency with the current (1977) HAP.

Meanwhile, pursuant to OMB Circular A–95, HUD also submitted the GDL application to the State of Pennsylvania and to the Delaware Valley Regional Planning Commission (DVRPC), for review and advice. The state returned the application to HUD without comment, requesting further documentation. The record provides no evidence that HUD complied with this request or made any further submission to the state. The DVRPC advised HUD to reject the GDL project because it was inconsistent with several regional housing plans, including the Montgomery County HAP. HUD failed to evaluate or otherwise act upon this recommendation.

On August 10, 1978, the MCPC submitted a revised HAP in support of the County's 1978 application for CDBG funds. The plan neither referred to nor provided for the proposed GDL project. Twelve days later, the HUD field office formally notified the MCPC that it had found the GDL proposal to be consistent with the County's HAP, despite the locational objections, and that HUD would therefore approve the project. The MCPC responded by reiterating the County's objections and explaining once again why Lower Moreland was not a desirable location for the proposed elderly hous-

---

4. It is clear that for purposes of the Community Development Program, Lower Moreland Township is simply a part of the area covered by Montgomery County's CDBG application, and the Township's housing needs are included in the County's HAP.

ing facility. Nevertheless, County officials anticipated that the field office would not alter its position, and they resigned themselves to acceptance of the project. The MCPC therefore concluded its response with a request that HUD waive the proportionality requirement to the extent of any impact the GDL project would have on the County's future housing goals.

Meanwhile, HUD was completing its review of the 1978 CDBG application, in which Montgomery County had requested a grant of $3,289,000. On August 28, 1978, HUD took the very action that the MCPC had hoped to avoid by opposing the GDL proposal from its inception. In a letter to the Honorable A. Russell Parkhouse, Chairman of the County Commissioners, the HUD field office stated that the 1978 HAP would have to be revised because it did not comply with HUD's proportionality requirement. The reason for this, of course, was that the recent approval of the GDL project gave the County a disproportionately high goal for elderly housing. Therefore, the HAP would have to be amended so as to provide corresponding increases in housing goals for the *non-elderly* household types.

The County responded in a lengthy letter to the field office on September 1, 1978. Noting that serious questions remained as to the legality of the GDL project and the manner in which it had been approved by the field office staff, the County declined to make the requested HAP revisions until a definitive ruling on the matter was received from HUD's central headquarters in Washington. The County specifically stated that if the field office decision was upheld, it would then amend the HAP as previously instructed.

This, however, did not prove satisfactory. On September 6, 1978, Field Office Director Don Morrow sent the County a telegram expressing a rather blunt ultimatum. Mr. Morrow pointed out that MCPC had objected only to the location of the GDL project,

and not to construction of the facility itself. In his view, the proportionality requirement was unaffected, since the 111 elderly' units would have to be accounted for regardless of where the project was built.[5] Mr. Morrow stated, therefore, that unless MCPC revised the HAP in accordance with his instructions, the field office would recommend disapproval of the County's *entire* application for $3,289,000 in CDBG funds. The telegram also set a deadline of September 7, 1978, thereby giving the County a scant 24 hours to consider the matter.

Despite the imminent loss of its entire housing assistance appropriation, however, the County persisted in its request for a resolution of the controversy by HUD central. On September 12, therefore, Mr. Morrow carried out his threat. In a memo to Robert C. Embry, Jr., HUD's Assistant Secretary for Community Planning and Development, the field office recommended disapproval of Montgomery County's entire 1978 CDBG application.

Shortly thereafter, HUD central acted on the repeated requests for resolution of the controversy. Essentially, the central staff reversed the field office decision. In a telegram to Mr. Morrow, dated September 29, 1978, Assistant Secretary Lawrence B. Simons noted that under the regulations, a local government can object to a project on the ground that "the proposed location . . is inconsistent with the general locations specified in the applicable HAP and is objectionable to the local government for reasons which are specified." The County had conformed precisely to this regulation. It had objected on the ground that Lower Moreland Township was not within an area of need identified by the HAP. Moreover, it had given the additional "reasons which are specified," viz., the Township already had two elderly housing facilities, and other areas of the County were in greater need. Therefore, Assistant Secretary Simons stat-

---

5. I do not share Mr. Morrow's view that the issue of location is irrelevant to the proportionality requirement. From the beginning, the County's objection to building the GDL project in Lower Moreland was based on the fact that it would preclude the construction of elderly facilities in other areas where they were more seriously needed, precisely because of HUD's proportionality regulations.

ed that "the Area Office . . . should not have made a finding that the application was consistent with the HAP. . . . [T]he section 202/8 proposal should not have been approved. . . ."

To HUD's officials, however, the resolution of the problem did not lie in simple disapproval of the GDL project. Rather, Mr. Simons suggested that in order "to avoid any undue hardship on the sponsor," the field office should offer the County its choice of two options:

(1) The County could negotiate with GDL and find another site for the project. The HAP would then have to be amended to provide for the 111 elderly housing units.

(2) The County could accept the GDL project at its present proposed site in Lower Moreland. HUD would then waive the proportionality requirement for 1978 and no HAP amendment would be necessary.

Accordingly, these options were transmitted to the County by the field office. In a reply letter to Mr. Morrow, dated September 25, 1978, Mr. Parkhouse announced the County's decision to accept option No. 2. Thus, the GDL project would be constructed at its proposed Lower Moreland site, and the proportionality requirement would be waived. The reasons underlying this decision were explained as follows:

We believe that in the long run, the interests of the lower-income elderly population of Montgomery County would best be served by utilization of a site that is consistent with our approved housing assistance plan. At the same time, we are cognizant of the problems this course of action would create for the approved non-profit sponsor and your office . . . We are, therefore, willing to acquiesce to the desires of Lower Moreland Township, the project sponsor, and your department to allow the project to proceed at its present site.

As a result, the field office withdrew its recommendation that the County's CDBG application be disapproved, and HUD central officially authorized a waiver of the proportionality requirement.

Throughout this tortuous course of events, the plaintiff homeowner's association sought redress by every available means. The association mounted organized opposition to the GDL project at the original zoning hearings held before the Lower Moreland Township Commissioners. They also made repeated requests for an administrative hearing, both with the field office and with HUD central. Their requests elicited no response. When it became clear that the GDL facility would be constructed as proposed by virtue of the County's decision to accept HUD's option No. 2, the plaintiffs instituted the present action seeking to enjoin HUD from disbursing funds for the use of the project.

### III. STANDING

■ As a threshold matter, I must determine whether the individual and associational plaintiffs have standing to maintain this action. Under section 10 of the Administrative Procedure Act, "A person . . . adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. It is well established that to satisfy this statutory requirement, a plaintiff must show "(1) that he has or will sustain some actual or threatened injury in fact resulting from the challenged agency action, and (2) that the alleged injury is to an interest 'arguably within the zone of interests to be protected or regulated by the statute in question.'" *Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29, 33 (3d Cir. 1978), quoting *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The interests involved may take a variety of forms. While injury to an economic interest will certainly be adequate, the basis for standing may also be found in infringements upon "noneconomic values," such as aesthetic, conservational, recreational, or religious interests. *Data Processing*, supra, 397 U.S. at 154, 90 S.Ct. at 830. Thus, for example, in *Concerned Residents of Buck Hill Falls*, supra, plaintiffs were

owners of property surrounding the site of a proposed dam. The Court of Appeals upheld their claim of standing on the ground "that construction of the dam will diminish the value of their properties and impair their enjoyment of the area's recreational and aesthetic resources." 537 F.2d at 33.

■ Similar claims of injury are raised in this case. Although plaintiffs have not directly alleged that the value of their homes will be impaired, they have demonstrated the likelihood of economic injury. Plaintiffs point out that the annual allotment GDL proposes to pay in lieu of property taxes will be inadequate to defray the cost of municipal services the facility will require. The difference will obviously be paid by residents of Lower Moreland, including the plaintiffs. Moreover, the Township's present police, fire, and sanitation capabilities will require improvements, and these too will be charged to Lower Moreland homeowners.

Plaintiffs also point to the aesthetic injury that will result from the construction of a four-story apartment building in an area dominated by single family homes, and to the severe traffic congestion that the GDL facility will cause in plaintiffs' immediate vicinity. I hold that these allegations are sufficient to satisfy the injury in fact requirement of *Data Processing*, supra.

■ It is also clear that plaintiffs' interests are arguably within the zone of interests which the statute seeks to protect. The complaint charges that construction of the GDL project at its proposed site in Lower Moreland will violate the review and objection procedures mandated by section 213 of the Housing and Community Development Act of 1974, 42 U.S.C. § 1439. Admittedly, section 213 itself speaks only to the rights of local governments. It is clear, however, that in determining the appropriate zone of interests, I must examine the entire statute, rather than merely the particular section which the defendant allegedly violated. *Concerned Residents of Buck Hill Falls*, supra, 537 F.2d at 33–34; *Davis v. Romney*, 490 F.2d 1360, 1365 (3d Cir. 1974).

■ I am fully persuaded that the interests advanced by the plaintiffs in the present case are within the zone of interests which Congress sought to protect in enacting the Housing and Community Development Act of 1974. While the principal beneficiaries of the Act are persons of low and moderate income, it is clear that the statute's purpose is to improve the quality of urban environments for all residents. See 42 U.S.C. § 5301(c). Toward that end, the statute and the regulations expressly require extensive citizen participation in the development of the local government's CDBG application and in the implementation of the entire housing assistance program. Specifically, the local government is required to provide the public with information regarding proposed activities and hold public hearings in order to obtain citizen viewpoints. 42 U.S.C. § 5304(a)(6); 24 C.F.R. § 570.303(a). The regulations mandate that "There shall be involvement of . . . residents of areas where a significant amount of activity is proposed . . . and civic groups who are concerned about the program." 24 C.F.R. § 570.303(c)(2). It is expressly contemplated that the citizens' role "may also include self-help activities carried out by citizen groups." 24 C.F.R. § 570.303(d)(2). The individual plaintiffs' formation of the plaintiff association and their pursuit of the present action through that association seem to fall well within the meaning of the "self-help activities" to which the regulation refers.

■ I find therefore that the interests advanced by the individual and associational plaintiffs are within the zone of interests which the Housing and Community Development Act of 1974 seeks to protect. Since the plaintiffs have also adequately alleged a threatened injury in fact, I hold that they have standing to maintain this action.

## IV. STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

■ The issuance or denial of a preliminary injunction is a matter firmly com-

mitted to the discretion of the district court. The exercise of that discretion must be guided by four considerations: (1) Has the movant made a strong showing that he is likely to prevail on the merits of the action? (2) Has the movant demonstrated that he will be irreparably injured without the injunctive relief that he seeks? (3) Will the issuance of the injunction substantially harm other interested parties? (4) Where does the public interest lie? *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976). The burden of proof as to all four of these factors rests squarely on the party seeking the injunction. Id.

1. Likelihood of Success on the Merits

■■■ Plaintiffs have demonstrated a strong likelihood that they will prevail on the merits of this suit. It is clear to me that the Secretary's actions leading to approval of the GDL project lacked any basis in law and constituted a serious abuse of her discretion.

Section 213 and its regulations state plainly that when a local government unit objects to a section 202 proposal on the ground of HAP inconsistency, the HUD field officer director *may not* approve the project unless he makes an independent determination based on substantial evidence that the project is consistent with the HAP. 42 U.S.C. § 1439(a)(2); 24 C.F.R. § 891.205(b)(2). In the present case, Montgomery County objected to the GDL project on the ground that the proposed site was inconsistent with the general locations specified in the current HAP. This objection was valid and adequate under the regulations. 24 C.F.R. § 891.204(b)(4). In response, Field Office Director Morrow purported to make an independent finding of consistency. Whether this finding satisfied the substantial evidence requirement is no longer material,[6] since the central staff in Washington subsequently reversed Mr. Morrow's decision. By this reversal, HUD disavowed any claim that the GDL project was consistent with Montgomery County's HAP.[7] In this circumstance the mandate of the statute is clear. Section 213 expressly states that "the Secretary may not approve the application unless he determines that the application is consistent with [the] housing assistance plan." 42 U.S.C. § 1439(a)(2). Since HUD central had foreclosed any such

---

**6.** There is serious reason to doubt that the determination of consistency made by the field office satisfied the substantial evidence requirement of 24 C.F.R. § 891.205(b)(2). The determination was announced in a letter from Field Office Director Morrow dated August 22, 1978. (Plaintiff's Ex. No. 35). The letter sets forth the bases for the decision in four numbered paragraphs.

In paragraph one, Mr. Morrow refers to the County's argument that Lower Moreland already contains a substantial number of elderly housing units. In response, he points out that the Township contains only three projects and the County had not contended that the GDL proposal would produce "an undue concentration of assisted persons." Paragraph two states that the County's objection to the GDL proposal was inconsistent with the position it took regarding an earlier housing project in nearby Abington Township. Paragraph three responds to the County's argument that Lower Moreland contains a below-average number of low-income elderly persons. Mr. Morrow states that this is irrelevant since the County had not objected to the marketability of the GDL project. Finally, paragraph four addresses the objection that other areas of the County are in greater need and more appropriate sites are available. To this, Mr. Morrow offered the following reply: "These bases for objection are obviously just the reverse of the two previous reasons cited. Consequently, our aforementioned response to those reasons may similarly be reversed to rebut these."

From even a casual reading, it is clear that the first three paragraphs merely criticize the County's bases for objection rather than offering affirmative evidence to support the determination of consistency. I find that paragraph four is susceptible of no reading at all, casual or otherwise, and I leave to greater minds the task of unraveling its logic.

**7.** It is clear that HUD firmly repudiated any suggestion of consistency between the GDL proposal and the County's HAP. Noting that the County's location-based objections were valid and adequate within the meaning of the regulations, Assistant Secretary Simons stated that "The Area Office . . . should not have made a finding that the application was consistent with the HAP. . . . The section 202/8 proposal should not have been approved. . . ." Memorandum, Simons to Morrow, Sept. 20, 1978; Plaintiffs' Ex. No. 47.

determination, the Secretary had no choice but to disapprove the GDL application.

Instead of complying with this strict statutory command, however, HUD offered the County two options, both of which embraced *approval* of the project. The first option would simply have changed the site of the GDL facility. Construction of the project at some location within Montgomery County was thus a pre-determined conclusion, and the County would have to make appropriate proportionality adjustments in its HAP. Option two called for acceptance of the GDL project at the proposed Lower Moreland site, with a corresponding waiver of the proportionality requirement.

■■■ The statute and regulations provide no authority for HUD's offer of these options to the County. Since the local government had raised a valid objection and HUD could claim no independent determination of consistency, the GDL application should simply have been disapproved. The project sponsor would then have to submit an entirely new application, if it so desired, proposing another site, which would not necessarily be in Montgomery County.[8] Once again, the appropriate unit of local government would be afforded the full opportunity for review and objection to which it is entitled under section 213.[9]

■■■ I am entirely unpersuaded by HUD's attempt to rebut the above analysis. Essentially, the Secretary argues that the present case actually presents the situation where the local government has *not* objected to the proposed project. As such, I am told that we are governed here by the provisions of section 213(a)(3) rather than (a)(2). Subdivision (a)(3) provides that if no objection is raised, the Secretary "may approve the application unless he finds it in-

consistent with the housing assistance plan." 42 U.S.C. § 1439(a)(3). This, of course, is the converse of subdivision (a)(2) which is discussed at length above.

The Secretary's theory here is that the County ultimately withdrew its objection to the GDL proposal by accepting HUD's second option. This act is said to have taken the case out of subdivision (a)(2) and placed it within the provisions of (a)(3). HUD argues that under subdivision (a)(3), where the local government does not object, the Secretary's discretion to *disapprove* an application is very narrow, and therefore, the *approval* of the GDL project could not be an abuse of that discretion.

This argument is practically frivolous. First, no reliance may be placed on the County's purported withdrawal of its objection because that withdrawal was effected pursuant to HUD's offer of an illegal option. Second, the withdrawal could hardly be deemed voluntary. The HUD field office had created a threatening and coercive climate, giving the County reasonable cause to believe that it would lose over three million dollars in housing assistance funds unless it acceded to HUD's demands. Finally, even if subdivision (a)(3) did control this case, the Secretary's approval of the GDL project would still be an abuse of discretion. As noted above, subdivision (a)(3) permits the Secretary to approve an application "unless he finds it inconsistent with the housing assistance plan." 42 U.S.C. § 1439(a)(3). HUD made precisely such a finding here. Assistant Secretary Simons' memo to Mr. Morrow stated expressly that "the Area Office . . . should not have made a finding that the application was consistent with the HAP." See note 7, supra.

8. I note that the original GDL application proposed a site in Southampton Township, Bucks County.

9. It is important to note that while the County objected to the present GDL application only on the ground of location, it might well have other objections to construction of the same facility at a different site. For example, the Field Office Director argued that the County had not questioned the marketability of the

project. See note 6, supra. The fact that the facility might be an economic success in Lower Moreland, however, has no bearing on its marketability elsewhere. Similarly, the County might object to construction of the project at another site on the ground that the type of housing proposed (i. e. "new construction") is not among the types needed in that particular area. See 24 C.F.R. § 891.204(b)(3).

Some attention must also be given to the substance of the two options proposed by HUD. Beyond the fact that the *offer* was itself illegal, the actual terms of the options were equally unauthorized.

Under option one, Montgomery County would negotiate with GDL to find another site for the project, and would then make an appropriate amendment in its 1978 HAP to reflect the 111 GDL units. It will be remembered that approval of the 1978 HAP was still pending. The HAP *in effect* at all times relevant to this suit was the one HUD had previously approved for 1977. Curiously, however, option one did not require the County to amend the 1977 HAP even though the GDL project would be approved within that document's effective time period.

 This is plainly inconsistent with the obvious intent of Congress that housing assistance is to be provided only in accordance with the needs and goals identified in an approved HAP. The law expressly requires that all CDBG applications be supported by an acceptable HAP, and that all section 202 proposals be reviewed for HAP conformity, 42 U.S.C. § 5304(a)(4); 42 U.S.C. § 1439. These statutory requirements are rendered utterly superfluous if HUD can cavalierly ignore a local government's current HAP in approving a housing assistance application.

At the hearing, Field Office Director Morrow testified that approval of the GDL proposal actually amounted to a *de facto* amendment of the 1977 HAP. This, however, would not cure the above-noted deficiency. On the contrary, it would make option one even more clearly illegal. The regulations provide that "Any amendment to a HAP shall not be applicable to section 202 or section 8 proposals submitted in response to a previously issued . . . notification of fund availability . . . ." 24 C.F.R. § 891.203(c).[10] The GDL proposal was submitted in response to such a notifi-

cation. Any amendment to a HAP, de facto or otherwise, that accommodates this proposal is therefore illegal.

Even more clear is the illegality of option two. First, the above discussion regarding a HAP amendment also applies to this option.

 Second, the Secretary's purported waiver of the proportionality requirement is completely unauthorized. As noted earlier, 24 C.F.R. § 570.306(c)(1) requires that a local government's HAP must set goals for meeting the respective needs of the three household types in the same proportion as it identifies those needs. Subdivision (c)(1)(A) sets forth the circumstances under which HUD may grant an exception to this requirement. They include such unusual occurrences as displacement of households, natural disasters, or the need to accommodate a feasible project which could not otherwise be developed. There is no reference to any circumstance resembling the facts of the present case. 24 C.F.R. § 570.-306(c)(1)(A). It is well to remember that this regulation was promulgated pursuant to the stated Congressional desire that housing assistance be provided in a manner "best suited to the needs of lower-income persons in the community." 42 U.S.C. § 5304(a)(4)(B).

The above discussion demonstrates that the procedure by which HUD approved the GDL application was illegal in several important respects, and I believe that there are ample grounds upon which a federal court could permanently enjoin the Secretary from disbursing funds for the proposed project. I hold, therefore, that plaintiffs have shown a very strong likelihood of success on the merits of this action.

**2. Irreparable Injury**

 There is no doubt that the irreparable injury requirement is fully satisfied in this case. As explained in my earlier

10. The regulation permits an exception to this rule where "the local government makes a determination that, because of special circumstances, the public interest requires that the amendment be applicable to such proposals."

24 C.F.R. § 891.203(c). Far from making any such determination regarding the public interest, it is clear that Montgomery County was dragged kicking and screaming into this plan from its inception.

discussion regarding standing to sue, the injury that threatens plaintiffs arises from the damage that GDL's multi-unit apartment complex will inflict on the residential community in which plaintiffs reside. It is obvious that the injury will be irreparable. No court order could reverse the detrimental effects of the project once construction has begun. Certainly, money damages would avail the plaintiffs nothing. In short, it is clear that plaintiffs have no adequate remedy at law, and they will suffer irreparable injury unless I grant the injunctive relief that they seek.

3. Injury to Other Interested Parties

The defendant argues strenuously that the issuance of the injunction sought by the plaintiffs here will substantially harm the low-income elderly residents of Montgomery County. HUD points out that the County's present elderly housing facilities are seriously inadequate, and that long waiting lists are maintained by the existing projects, including those in Lower Moreland. Therefore, I am told that an order enjoining construction of the GDL facility will result in hardship for the elderly. Nevertheless, despite its emotional appeal, I find this to be an unconvincing argument.

First, I note that no individual or group purporting to represent the elderly sought to intervene in this action. At the very least, this indicates that the elderly saw no need to make their views known in this court. Moreover, the defendant made no effort to demonstrate the opinions of persons who might have wished to reside in this project. By its own regulations, HUD was supposed to have required the solicitation of the elderly's views before approving the County's HAP, which did not designate Lower Moreland as an area in need of senior citizen housing. See 24 C.F.R. § 570.303. Nevertheless, no one has told me what the results of this process were, or even if the requirement was ever complied with.

Above all, I find that HUD's actions in approving the GDL application were not motivated by a concern for the County's elderly. In his September 20, 1978, memo to Mr. Morrow, HUD's Assistant Secretary Simons stated that the County's interpretation of the regulation had been correct, the field office should not have found the GDL application to be consistent with the HAP, and the "Section 202/8 proposal should not have been approved." See note 7, supra. Rather than directing disapproval of the application, however, he suggested his two options, both of which called for approval. His reason for doing so was "*to avoid any undue hardship on the sponsor.*" Plaintiff's Ex. No. 47. (emphasis added). The true beneficiaries of HUD's actions were identified in the County's explanation of why it had reluctantly decided to choose option two:

We believe that, in the long run, the interests of the lower-income elderly population of Montgomery County would best be served by utilization of a site that is consistent with our approved housing assistance plan. At the same time, we are cognizant of the problems this course of action would create for *the approved nonprofit sponsor and your office* . . . . We are, therefore, willing to acquiesce to the desires of *Lower Moreland Township, the project sponsor and your department* to allow the project to proceed at its present site.[11]

It is evident, therefore, that this proposal was approved by a process that subordinated the interests of senior citizens to those of HUD, GDL, and Lower Moreland Township.[12]

In my view, the County was quite correct in its assessment of the senior citizens' interests. Due to the much-discussed proportionality requirement, construction of the

---

11. Letter of A. Russell Parkhouse, Chairman, Montgomery County Commissioners, to Don Morrow, HUD Philadelphia Field Office Director, September 25, 1979. Plaintiff's Ex. No. 49 (emphasis added).

12. It will be remembered that while the plaintiff residents of Lower Moreland opposed the project, the Township Commissioners were in favor of the plan and voted to approve the necessary zoning change.

 

GDL project where it is unnecessary may well prevent future funding for elderly housing facilities in communities having serious need. This possibility was graphically illustrated when the HUD field office announced that, because the GDL project had been "approved," the County would have to amend the 1978 HAP in order to increase its goals for *non-elderly* housing. This problem would not be cured by option two's purported waiver of the proportionality requirement. First, as seen earlier, the waiver was illegal. Second, the waiver applied only to the 1978 HAP. If approved, the GDL facility would have to be counted thereafter as "housing assistance provided" for the elderly in Montgomery County. The project would thus have a continuing impact on the County's compliance with the proportionality rules.

I am persuaded, therefore, that the issuance of this injunction will protect, rather than harm, the interests of Montgomery County's low-income elderly residents.

### 4. The Public Interest

Finally, I am convinced that the public interest favors the granting of the relief that plaintiffs seek. First, as explained above, I believe that the issuance of this injunction will facilitate the construction of senior citizen housing projects where they are truly needed. Certainly, this is in the best interests of all members of society.

Second, a subtle but important concern must not be overlooked in a case such as this. The prevailing statutory scheme requires local governments to formulate and justify extensive plans for meeting the needs of their low-income populations. This entails the expenditure of considerable time and effort by local officials, as well as uncounted thousands in tax dollars. If the federal bureaucracy is permitted to treat this local planning with indifference, the public interest must surely suffer. Congress has expressed a clear policy that the disbursal of public assistance funds is to be guided by the judgment and discretion of local authorities. By scrupulously enforcing that policy, the federal courts will best serve the interests of all concerned.

### V. CONCLUSION

For all the reasons explained above, I will grant the relief sought by the plaintiffs, enjoining the disbursal of any funds for the use of the proposed GDL housing facility until the merits of this action are fully adjudicated.