**WINCHESTER COALITION FOR RE-SPONSIBLE DEVELOPMENT, and Jeff Bisker, Plaintiffs,**

v.

**U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.**

and

**STATE ex rel. Patrick NEARY, and State ex rel. Patrick A. Haven, Plaintiffs,**

v.

**COLUMBUS METROPOLITAN HOUSING AUTHORITY, INC., Defendant.**

Nos. C2–98–00165, C2–98–00144.

United States District Court,
S.D.Ohio,
Eastern Division.

March 27, 1998.

Joseph Scott Streb, Columbus, OH, for plaintiffs.

O. Charles Hosterman, U.S. Attorney's Office, Columbus, OH, for defendant.

## OPINION AND ORDER

MARBLEY, District Judge.

### INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment (docs. 33, 25) and Plaintiffs' Cross–Motion for Summary Judgment (docs. 32, 24).[1] Plaintiffs have filed an action seeking declaratory and injunctive relief from Defendants' decision to build low-income housing in their neighborhood, the Canal Winchester area. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiffs Motion for Summary Judgment is **DENIED**.

### FACTUAL HISTORY

On September 11, 1996, CMHA requested HUD approval for the purchase of a tract of land located along Gender Road ("Hunter's Ridge Site"), either with HUD funds or with CMHA funds subject to a later reimbursement from HUD. The purpose of the purchase was to begin the building and development of low-income housing in the area called Hunter's Ridge. On September 17, 1996, HUD approved the purchase with CMHA funds and agreed to reimburse CMHA later for the project. On November 1, 1996, CMHA purchased the property through a wholly-owned Ohio corporation called the Gender Road GP Corp.

On May 30, 1997, CMHA submitted a "Development Proposal" for the Hunter's Ridge project. On August 22, 1997, HUD approved the project and authorized CMHA to purchase the property using HUD funds from the HOPE VI program. On August 26, 1997 CMHA purchased the Hunter's Ridge Site from the Gender Road GP Corp.

On December 17, 1997, HUD withdrew its approval for the Hunter's Ridge project because, *inter alia*, there was an inadequate Environmental Assessment. On January 30, 1998, after a corrected Environmental Assessment was filed, HUD again approved the Hunter's Ridge project. This action followed.

With respect to the procedural history, Plaintiffs first filed a suit in federal court in late December, 1997, seeking to prevent HUD approval of the Hunter's Ridge project and construction of the housing by CMHA. At that time, HUD had withdrawn its approval, so Plaintiffs voluntarily dismissed the case in lieu of a Freedom of Information Act complaint for documents related to the project. When HUD reapproved the project, Plaintiffs filed an action in state court alleging that CMHA had exceeded its authority. CMHA promptly removed the case to federal court, asserting that the case was essentially a claim that CMHA violated federal law. Around the same time, Plaintiffs filed an action against HUD in federal court under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* alleging that HUD's decision to approve the Hunter's Ridge project was "arbitrary and capricious." These cases were then consolidated before this Court.

### LEGAL ANALYSIS

#### I. Standard For Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as

---

1. The first number in parentheses denotes the docket number in Case No. C2:98 CV 144, while the second denotes the docket number in Case No. C2:98 CV 165.

to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Summary judgment appropriate where the evidence could not lead a trier of fact to find for the non-moving party).

In a Rule 56 motion, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## II. Standing of the Plaintiffs

Defendants challenge whether Plaintiffs have standing to bring this action. The question of standing is whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing subsumes a blend of constitutional requirements and prudential considerations. *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To meet constitutional standing, a plaintiff must demonstrate an actual or threatened injury as a result of putative illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision of the Court. *Id.* Additionally, to satisfy prudential considerations, a plaintiff must demonstrate that he is asserting his own legal rights and interests. *Id.* For actions challenging agency decisions under the APA, prudential considerations require that a plaintiff assert claims which fall within the "zone of interest" of the applicable statutes or regulations. *Ass'n of Data Processing Service Org. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

It is undisputed that Plaintiffs have met the requirements for constitutional standing under Article III. Plaintiffs have demonstrated a threatened injury as a result of the putative "arbitrary and capricious" decision of the Defendants. *Valley Forge,* 454 U.S. at 471–472. Furthermore, Plaintiffs' injury fairly can be traced to the challenged action of the Defendants, and is likely to be redressed by a favorable decision of the Court. *Id.* The only question with respect to standing before the Court is whether Plaintiffs meet the prudential requirement of falling within the "zone of interest" of the applicable regulations and statutes in such a manner as to be considered an "aggrieved party" under the APA.

The Sixth Circuit has adopted the liberal interpretation of prudential "zone of interest" test set forth in *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). In *Clarke,* the Court stated that

the "zone of interest" test is a guide for deciding whether in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to per-

mit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* 479 U.S. at 399–400. *See also Community First Bank v. National Credit Union Admin.*, 41 F.3d 1050, 1054 (6th Cir.1994) (containing Sixth Circuit restatement of *Clarke* ).

■ Post-*Clarke*,[2] the Sixth Circuit has applied these general considerations in an arguably broad permissive manner. *See, e.g., Michigan Gas Co. v. Federal Energy Regulatory Comm'n*, 115 F.3d 1266, 1271–72 (6th Cir.) (permitting natural gas industry competitor to claim zone of interest under statute aimed at protecting consumers). In the unpublished *National Air Traffic Controllers Ass'n v. Pena*, 78 F.3d 585, 1996 WL 102421 (6th Cir.1996), the Sixth Circuit followed *Clarke*, noting that: (1) an inquiry into standing begins with determining which statutes are relevant, which can be determined from the substance of the complaint; (2) a court is " 'not limited to considering the statute under which [plaintiffs sue], but may consider any provision that helps ... understand Congress' overall purposes' behind the relevant statute;" and (3) no explicit statutory provision providing expressly for the plaintiff's interest need be found, as legislative history may be used in determining a statute's zone of interest. *Id.* at *3–4. Notably, the court stated that the "[p]laintiffs' interest must only be *arguably* within the zone of interests of the relevant statute." *Id.* at *2 (citing *Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding and Dry Dock Co.*, 514 U.S. 122, 115 S.Ct. 1278, 1283, 131 L.Ed.2d 160 (1995)) (emphasis added). However, where Congress has manifested an express statement of purpose in legislation, and a party's claim bears no rational relationship to that pur-

pose, the party does not fall within that statute's zone of interest. *See, e.g., District 2, Marine Eng'rs Beneficial Ass'n v. Burnley*, 936 F.2d 284 (6th Cir.1991) (finding clear language of statute precluded plaintiff's falling within zone of interest).

■ In light of the Sixth Circuit's adoption of *Clarke*, the Court finds that Plaintiffs have asserted claims which fall within the "zone of interest" of the applicable statutes and regulations involved in this case. One of the underlying purposes of the applicable statutes and regulations in this matter is to ensure that the legitimate concerns of the surrounding community for a proposed project are taken into consideration. *See* 40 C.F.R. § 1508.27 (an agency is obligated to consider the context and intensity of the impact that a proposed project may have on a surrounding community). Plaintiffs in this matter have asserted that the project will have a significant damaging impact on their community. Thus, Plaintiffs have asserted claims which are rationally related to the underlying purposes of the applicable statutes and regulations in this matter.

Defendants' reliance on *Alschuler v. Department of Hous. and Urban Dev.*, 686 F.2d 472 (7th Cir.1982) is misplaced. *Alschuler* is not controlling authority in the Seventh Circuit, let alone elsewhere. The Seventh Circuit revisited its narrow interpretation of "zone of interest" standing in *City of Milwaukee v. Block*, 823 F.2d 1158 (7th Cir. 1987), and adopted the broad interpretation set forth in *Clarke*. The court concluded that "[i]n light of the Supreme Court's ... decision in [*Clarke* ] ... our prior cases do not correctly reflect the Supreme Court's teaching in *Data Processing* [,397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184] ... "[3]

The present case is factually similar to the situation in *Cornell Village Tower Condominium v. Department of Hous. and Urban*

---

**2.** Prior to 1987 *Clarke*, the Circuit was arguably more selective in finding that a plaintiff fell within a statute's zone of interests. *See Dominion Nat'l Bank v. Olsen*, 771 F.2d 108 (6th Cir.1985) (finding coverage by zone of interests for out-of-state plaintiffs who could only bring suit under statute in district court provided no state court remedy existed; none did); *R.T. Vanderbilt Co. v. Occupational Safety and Health Review Comm'n*, 728 F.2d 815, 818 (6th Cir.1984) (finding that third party that was neither benefitted nor regu-

lated by statute fell outside zone of interests); *American Postal Workers Union v. Independent Postal System of Am., Inc.*, 481 F.2d 90, 92 (6th Cir.1973) (noting that governmental agency must be involved, as the test is inapplicable in disputes between only private parties).

**3.** Defendants also rely on *Glendale Neighborhood Ass'n v. Greensboro Housing Authority, et al.*, 956 F.Supp. 1270 (M.D.N.C.1996), where the court ruled that the plaintiffs did not have standing

*Dev.*, 750 F.Supp. 909 (N.D.Ill.1990). There, a condo association brought suit under the APA against HUD alleging that HUD's decision to place low-income housing in their neighborhood was "arbitrary and capricious" and an abuse of discretion. The plaintiffs alleged that their property values would decrease, and that HUD violated a regulation regarding "expected neighborhood impact" when it did not consider such important factors as congested traffic and increased population density in making its decision. The court found that the plaintiffs satisfied their burden with respect to standing by asserting an interest which coincided with the purpose behind the challenged congressional enactment. *See also Lower Moreland Homeowner's Ass'n. v. Department of Hous. and Urban Dev.*, 479 F.Supp. 886 (E.D.Pa.1979) (the court found that a homeowner's association had standing under the APA to assert its claims challenging a HUD decision to finance a senior citizen's home in their community).

### III. Standard of Review for APA Actions

The Court has previously ruled in this case that judicial review under the APA for a claim of "arbitrary and capricious" agency action is limited to the administrative record. As the Supreme Court stated in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Id.* 401 U.S. at 420. In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Court discussed one of the exceptions to the rule that judicial review is limited to the administrative record:

> If ... there was such failure to explain administrative action as to frustrate effective judicial review, the remedy [is] not to hold a de novo hearing but ... to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.

*Id.* 411 U.S. at 142–43. The Court also noted that when an agency contemporaneously issues a decision and findings upon which the decision is based, and those findings are inadequate to sustain the agency's decision, the reviewing court must vacate the agency decision and remand for further consideration. *Id.* at 143.

■ Plaintiffs' primary challenges to the Hunter's Ridge project relate to whether HUD completed an adequate Environmental Assessment of the site as required by the National Environmental Policy Act ("NEPA").[4] The mandates of NEPA are primarily procedural, not substantive, and, therefore, judicial review is limited to the issue of whether an agency followed the procedures pursuant to NEPA, and not the wisdom of agency decisionmakers. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). In *Strycker's Bay*, a group of plaintiffs sued HUD to enjoin the building of low-income housing on New York's Upper West Side. The plaintiffs alleged that HUD did not place sufficient weight on certain environmental factors in reaching the decision to place the low-income housing on the Upper West Side. The appellate court found that HUD did not give the appropriate "determinative" weight to certain environmental factors, such as crowding. *Id.* 444 U.S. at 227. The Supreme Court reversed the appellate court, setting forth the following parameters for judicial review of agency findings pursuant to NEPA:

> In *Vermont Yankee [Nuclear Power Co. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)] ... we stated that NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." As we stressed in that case, NEPA was designed to insure a fully informed and well-considered decision, but not necessarily a decision the judges of the Court of

---

under the APA to sue. However, the court in *Glendale* also relied upon *Alschuler* to support its decision. Because it rests upon restrictive rationale which has been expressly rejected. *Glendale* is neither persuasive nor instructive.

**4.** 42 U.S.C. § 4321 *et seq.* In the present case. NEPA is incorporated by reference into the challenged .HUD regulations. *See e.g.* 24 C.F.R. § 50.1 (HUD Protection and Enhancement of Environment Quality . Regulations implement NEPA).

Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. *Vermont Yankee* cuts sharply against [a] conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"

*Id.* at 227 (citations omitted).

This District Court addressed a similar issue in *Davison v. Department of Defense,* 560 F.Supp. 1019 (S.D.Ohio 1982). There, the plaintiffs challenged an agency decision to turn a military airport into one for civilian use. The plaintiffs alleged that the Environmental Impact Statement prepared by the Air Force did not sufficiently assess the noise pollution. *Id.* at 1022. The court found that the voluminous Environmental Impact Statement, which dealt with noise pollution in several different ways, was sufficient in light of the principles set forth in *Strycker's Bay.* Judge Duncan defined the scope of judicial review:

> With respect to [an Environmental Impact Statement], the scope of review is correspondingly narrow. The "detailed statement" requirement of NEPA was designed not to give federal judges a means by which to second guess agency decisionmakers, but rather to allow the courts to assure that the agency in question has made a good faith effort to explore the concerns voiced within the statute.

*Id.* at 1025.[5]

## IV. Plaintiffs' Challenges to Defendants' Decision

*Acquisition of the Hunter's Ridge Site*

Section 941.205(c) of Title 24 of the Code of Federal Regulations states in relevant part:

When HUD approval is required. The PHA is authorized to execute all development-related contracts without prior HUD review or approval with the exception of:

(1) All forms of site or property acquisition contracts regardless of development method;

24 C.F.R. § 941.205(c).[6] In addition, § 941.303 provides:

When a PHA determines that it is necessary to acquire land for development through new construction, it may spend funds authorized under this part to acquire development sites. HUD must approve a PHA's proposed use of funds before it may acquire sites in this manner.

24 C.F.R. § 941.303. Furthermore, § 50.3 prohibits the acquisition of property by a PHA without HUD approval for HUD grant programs where funding approval is required. 24 C.F.R. § 50.3.

Plaintiffs contend that Defendants have failed to comply with §§ 941.205, 941.303 and 50.3. Plaintiffs argue that CMHA acquired the Hunter's Ridge Site without prior and appropriate HUD approval. Furthermore, Plaintiffs argue that CMHA failed to submit a written proposal, including an environmental assessment, to HUD prior to acquiring the Hunter's Ridge Site. Plaintiffs also contend that Defendants' failure to comply with these regulations demonstrates the "arbitrary and capricious" nature of Defendants' decision.

■ The administrative record demonstrates that Defendants complied with the applicable regulations in acquiring the Hunter's Ridge Site. First, the regulations are not fully applicable to this case because CMHA acquired the property with its own funds. To the extent that the regulations apply, the administrative record establishes that HUD approved CMHA's purchase of the Hunter's

---

5. In the present matter, HUD prepared an Environmental Assessment which is slightly different than an Environmental Impact Statement, as will be explained later. The standard of judicial review for both, however, is the same.

6. "PHA" is an abbreviation for Public Housing Authority, which is CMHA in this case.

Ridge Site prior to the 1996 acquisition by Gender Road GP Corporation, as well as the 1997 acquisition by CMHA from the Gender Road GP Corporation. On September 17, 1996, HUD sent a letter to CMHA approving the purchase of the Hunter's Ridge Site without HUD funds, and agreeing to reimburse CMHA for the purchase at a later date. On August 30, 1997, HUD sent a letter to CMHA authorizing the use of HOPE VI funds for reimbursement purposes related to the acquisition of the Hunter's Ridge Site.

Furthermore, the administrative record demonstrates that CMHA submitted a proposal and Environmental Assessment prior to receiving approval from HUD. On September 11, 1996, CMHA submitted to HUD a proposal to acquire the Hunter's Ridge Site, as well as a request to use HUD funds for the purchase or to receive reimbursement at a later date, as required by the regulations. The Environmental Assessment, which was submitted to HUD in conjunction with that letter, is contained in the administrative record. Plaintiffs seem to be concerned with the *quality* of the assessment as opposed to whether one was performed. That concern is beyond the Court's scope of review, which is limited to the question of whether the agency followed the applicable procedures. *Strycker's Bay*, 444 U.S. at 227. In this case, the administrative record is clear that CMHA submitted the required proposal, including the Environmental Assessment and, therefore, Defendants properly adhered to the applicable regulations. Based on the foregoing, the Court finds that the Hunter's Ridge Site was properly acquired by CMHA.

### Environmental Assessment

Section 941.303(e) of Title 24 of the Code of Federal Regulations provides, in relevant part:

> When a PHA determines that it is necessary to acquire land for development through new construction, it may spend funds authorized under this part to acquire development sites. HUD must approve a

PHA's proposed use of funds before it may acquire sites in this manner. A PHA must submit the following documents for HUD review and approval ... all available environmental information on the proposed development [environmental assessment].

24 C.F.R. § 941.303(e). Similarly, § 941.304 provides, in part, that "[e]ach full proposal [from a PHA] shall include at a minimum ... all available environmental information on the proposed development [environmental assessment]." 24 C.F.R. § 941.304(*l* ).

Plaintiffs primarily argue that the Environmental Assessment in the administrative record does not adequately address the significant concerns of those who currently live in the Canal Winchester community. Plaintiffs further allege that the Environmental Assessment does not comply with the requirements of 24 C.F.R. Parts 50 or 58.[7] Plaintiffs contend that Defendants did not adequately address the risk of flooding in the Environmental Assessment, and that the mere risk of a flood is sufficient to trigger either Defendant's obligation to prepare an Environmental Impact Statement pursuant to 24 C.F.R. § 55.10. Plaintiffs point out that HUD is obligated to reject a proposal which has significant adverse environmental impacts. 24 C.F.R. § 50.3.

The Court finds that Defendants conducted an appropriate Environmental Assessment in compliance with the applicable regulations. It is true that 24 C.F.R. Parts 303 and 304 require that a PHA submit an Environmental Assessment with its application to HUD for housing projects and funding, but *only where funds are being used to purchase the property.* Here, CMHA purchased the property with its own funds. To the extent that the regulations could apply to Defendants, the administrative record demonstrates that Environmental Assessments were submitted prior to HUD's approval to use HOPE VI funds in 1997 and 1998.

---

7. Plaintiffs' reliance on the requirements under Part 58 are misplaced in this case, as only § 50.1 *et seq.* applies. Section 58.1 *et seq.* applies to housing programs under 42 U.S.C. § 1437*x*. Plaintiffs attach legislative notes regarding the HOPE VI program to their Reply Brief. The legislative notes state clearly that the HOPE VI program is under 42 U.S.C. § 1437*l*. Therefore, the regulations of 24 C.F.R. § 58.1 *et seq.* are inapplicable.

The Court further finds that the mere risk of a flood does not necessarily trigger an obligation under 24 C.F.R. § 55.10 to prepare an Environmental Impact Statement. Section 55.10 requires an agency to comply with the decision points of 24 C.F.R. § 50.17 or other applicable sections. Section 50.17, in turn, requires that either an Environmental Assessment with a FONSI [8] or an Environmental Impact Statement be prepared in accordance with the decision points listed in the section. CMHA filed an Environmental Assessment with a FONSI, which clearly satisfies the regulatory requirements.

Plaintiffs seem to misunderstand the difference between an Environmental Assessment with a FONSI and an Environmental Impact Statement. An Environmental Impact Statement is only required when an agency makes a finding that the proposed action will have a "significant" environmental impact on a location, as "significant" is defined in 40 C.F.R. § 1508.27. 24 C.F.R. § 50.33. Section 1508.27 of Title 40 of the Code of Federal Regulations requires an agency to consider the impact of a project with respect to both context and intensity. *Id.* 40 C.F.R. § 1508.27 "Context" requires an agency to analyze the impact of a project on "society as a whole (human, national), the affected region, affected interests and locality." *Id.* For site-specific projects, local interests are weighed more heavily than national interests.

"Intensity" requires consideration of the severity of a proposed project's impact. *Id.* Section 1508.27 lists 10 factors which should be considered. Pertinent to the present matter are the following, as denoted by the subparagraph numbers under subsection (b) of the section: (2) the degree to which the proposed action affects public health or safety; (3) proximity to wetlands or ecologically critical areas; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. 40 C.F.R. § 1508.27(b)(2).

8. Finding of No Significant Impact.

These factors are squarely addressed in the Environmental Assessment, as well as the related documents attached in the administrative record. CMHA took into account such factors as "site suitability, access, and compatibility with surrounding development," "schools, parks, recreation, and social services," "emergency health care, fire and police services," and "commercial/retail and transportation." Plaintiffs again seem to take issue with the Defendants' *conclusions* regarding the project's impact, as opposed to whether critical factors were considered, as required. This Court cannot, and will not, address the wisdom of Defendants' conclusions regarding the project's impact on the surrounding neighborhood; rather, the pertinent inquiry is whether HUD took "impact" into consideration. The administrative record indicates that HUD did so.

Also, Floodplain Management is addressed in the Environmental Assessment under the "Compliance Findings for § 50.4." The 100-year flood plain will contain only 11 of the 22.83 acres of the project, none of which will contain residential housing. Only an access road and a playground are scheduled to be placed on the flood plain. CMHA states in its Environmental Assessment that it has followed an 8-step flood plain process, which was approved by HUD.

Based on the foregoing, the Court finds that the Environmental Assessment in the administrative record complies with 24 C.F.R. §§ 941.303, 941.304, 50.1 *et seq.,* and 55.10.

### Social Services, Public Transportation, and Jobs

Section 941.202 of Title 24 of the Code of Federal Regulations provides in relevant part:

Proposed sites for public housing projects to be newly constructed or rehabilitated must be approved by the field office as meeting the following standards:

(g) The housing must be accessible to social, recreational, educational, commercial, and health facilities and services, and other municipal facilities

and services that are at least equivalent to those typically found in neighborhoods consisting largely of similar unassisted standard housing.

(h) Travel time and cost, via public transportation or private automobile, from neighborhood to places of employment providing a range of jobs for low-income workers must not be excessive.

Plaintiffs argue that Defendants did not consider the impact of the Hunter's Ridge project and its tenants on the Canal Winchester area's municipal services. Plaintiffs argue that Defendants did not adequately consider the effect of the Hunter's Ridge project's children on the local school system. Plaintiffs also take issue with HUD's alleged inadequate consideration of transportation to and from jobs for low-income workers.

The Court finds that Defendants adequately considered these factors in the Environmental Assessment. As stated in the previous section, Defendants found adequate police, fire and health services in existence, and the impact of the Hunter's Ridge project's tenants on these services would not be significant. With respect to social services, CMHA's agreement to place an on-site social service center is noted in the Environmental Assessment. Furthermore, CMHA also agreed to provide transportation in the form of a shuttle to help counterbalance the lack of public transportation in the area. This shuttle would also provide transportation for Hunter's Ridge project tenants to social service programs and jobs around the greater Columbus area.

Based on the foregoing, the Court finds that the Environmental Assessment complies with the requirements of 24 C.F.R. § 941.202.

## CONCLUSION

The Court finds that the Defendants' decision to construct the Hunter's Ridge project in the Canal Winchester area complied with all applicable regulations, including NEPA as incorporated into the Code of Federal Regulations. For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment, and **DENIES** Plaintiffs' Cross-Motion for Summary Judgment. Judgment is rendered in favor of the Defendants on all claims.

**IT IS SO ORDERED.**