Donald BURKHOLDER,
et al., Plaintiff,

v.

Kenneth R. WYKLE, et al., Defendant.

No. 1:01CV1165.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 22, 2002.

Denise J. Knecht, Edward G. Kramer, Kramer & Associates, Cleveland, OH, Frederick M. Gittes, Gittes & Schulte, Richard C. Sahli, Columbus, OH, for Plaintiff.

Arthur I. Harris, Office of the U.S. Attorney, Northern District of Ohio, Cleveland, OH, Fred R. Wagner, Beveridge & Diamond, Washington, DC, Frederick C. Schoch, Office of the Attorney General, State of Ohio, Transportation Section, Stephen H. Johnson, Office of the Attorney General, State of Ohio Transportation Section, Transportation Section, Thomas P. Pannett, Office of the Attorney General, State of Ohio, Transportation Section, Columbus, OH, for Defendant.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On May 14, 2001, Donald and Marilyn Burkholder, plaintiffs, initiated the above-captioned case against Kenneth R. Wykle,[1] Administrator of the Federal Highway Administration ("FHWA"), and Gordon Proctor, Director of the Ohio Department of Transportation ("ODOT"), defendants. Specifically, the plaintiffs allege numerous violations of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"), the National Federal Aid Highway Act, 23 U.S.C. § 100, *et seq.* ("Highway Act"), and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), and seek to enjoin the state and federal agencies from completing the expansion and relocation of U.S. Route 30 until such time as an Environmental Impact Statement ("EIS") can be completed.

As the claims arise under the above-stated laws of the United States, jurisdiction is properly predicated upon 28 U.S.C. § 1331.

On November 2, 2001, both parties filed cross motions for summary judgment (Docket Nos. 21 and 23).[2] On August 27, 2001, the administrative record was filed with this Court (Docket No. 13) and, on October 25, 2001, November 5, 2001, and December 10, 2001, the parties supplemented the record (Docket Nos. 19 and 24) and identified specific relevant portions therein (Docket No. 38).[3] The Court finds that the issues have been fully briefed by the parties and that an evidentiary hearing on the matter is unnecessary.

For the following reasons, the plaintiffs' motion for summary judgment is DENIED and the defendants' motion for summary judgment is GRANTED.

### I. FACTS

The facts are largely undisputed. U.S. Route 30 ("US 30") is part of the Lincoln

---

1. The defendants indicate that Mary E. Peters should be substituted as Administrator of the Federal Highway Administration (Defendant's Motion for Summary Judgment).

2. On November 19, 2001 both parties filed Memoranda in Opposition (Docket Nos. 29 and 30) and, on December 3, 2001, both filed Replies (Docket Nos. 33 and 34).

3. The record in this case exceeds 24,000 pages. Collectively, these documents will be cited in this Memorandum as "AR" and followed by a six-numeral page number. The Environmental Assessment, which has also been filed with this Court, will be cited as "EA" and followed by a specific page or section number therein.

Highway, the first transcontinental highway in the United States, and extends from Atlantic City, New Jersey to Astoria, Oregon (EA p. 1; AR004862). In Ohio, U.S. 30 spans 242.1 miles, the entire width of the state (*Id.*). At the present time, approximately 54 percent of the highway in Ohio exists as a four-lane, divided highway, while the remaining 46 percent, divided into seven discrete segments, consists of a "2–lane or multi-lane undivided rural highway." (*Id.*). The Ohio Department of Transportation has identified U.S. 30 as a "Macro Corridor" and desires to upgrade the remaining seven segments so that a four-lane, divided highway will then span the entire state (*Id.*; AR004859; *Access Ohio*).

The instant controversy concerns the upgrade of one such segment and the proposed relocation of approximately 16.31 miles of the highway between the cities of Bucyrus and Ontario, Ohio ("the project area"). At present, the road is a two lane, undivided highway, but is abutted, at both its eastern and western termini, by modern four-lane, limited access freeways.[4] ODOT has examined the possibility of improving this section of road, with varying degrees of interest, since the 1970s when the roads on either end of the project area were improved. (Plaintiffs' Motion for Summary Judgment, p. 24; EA p. i). By the 1990s, however, ODOT had determined that the existing two-lane highway was insufficient to accommodate present and

future traffic, and began to consider the instant upgrade in earnest. (AR013019).[5]

On June 7, 1993, the state retained the firm of McCoy/Fok & Associates, Inc. ("McCoy/Fok") to prepare a preliminary study of the project and its associated environmental, economic, social, and cultural impacts. (AR003678).[6] McCoy/Fok then began the task of reviewing the relevant literature (AR004137), coordinating their efforts with those of other governmental agencies (EA p. 62; EA Table 16; EA Appendix E), and conducting appropriate ecological investigation. (AR001558).

On November 4, 1993 and January 26, 1995, ODOT conducted public hearings wherein public input was sought and comments were recorded. (AR003634; AR003664; AR017221; AR018511). While the information presented at the 1993 meeting was more generalized, at the 1995 meeting, ODOT informed the residents that four alternative routes had been developed for U.S. 30, and that a "no build" alternative was being considered as well. (AR003634). On December 10, 1996, purportedly based upon "environmental issues, comments received from citizens attending the public meeting and responses received after the meeting", ODOT issued a press release, which indicated that a "preferred route" had been selected. (AR012636). On April 22, 1999, ODOT convened a third public meeting to discuss this decision. (AR012457).

---

**4.** The stretch of highway at the project area's western end (Bucyrus Bypass) was completed in 1971, while the portion on its eastern end (Ontario Bypass) was improved in 1978. (EA p. ii).

**5.** The Environmental Assessment avers that the existing roadway has, *inter alia*, (1) an excessive amount of traffic, especially heavy truck traffic (EA p. 4), (2) a higher-than-average accident rate (EA pp. 6–7), and a "poor" level of service (EA p. 5). Specifically, the report avers that "the traffic conditions [in

the project area] are reaching the limits of the roadway capacity [and] future increases in traffic volume will push the capacity of the 2–lane highway to its limit causing a complete breakdown in flow." *See also*, FONSI at AR024239.

**6.** The 1993 contract with McCoy/Fok called for the preparation of an Environmental Impact Statement (AR003678). When the final study was prepared for submission to FHWA, however, the document was in the form of an Environmental Assessment.

After seven years of preparation, on November 27, 2000, ODOT issued an Environmental Assessment, prepared by McCoy/Fok, and submitted the document to FHWA, the project's financier [7] for the return of either a Finding of No Significant Impact, which would permit the project to go forward without further environmental review, or instructions to prepare a more detailed Environmental Impact Statement.[8] On January 25, 2001, the environmental document was presented to the public at a formal hearing and comments were again sought regarding the adequacy of the document, the process by which it had been prepared, and the ultimate conclusion that no significant environmental impacts were created by adopting the preferred route. (AR024150).

On April 12, 2001, based on the EA, the FHWA authorized the construction of the 16.31 mile relocation of U.S. 30 by issuing a Finding of No Significant Impact, and obviated the preparation of an Environmental Impact Statement (AR024239).

Unfortunately, the identified "preferred alternative" discussed above passes through property presently occupied by the plaintiffs' home. Not surprisingly, the plaintiffs herein object to both this determination and the process by which it was reached.

## II. STANDARD OF REVIEW

When examining the propriety of a federal agency's action upon a motion for summary judgment, a reviewing Court must base its decision upon both the summary judgment standard of review, and the analysis required by the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*

This being so, the Court will briefly examine both standards.

### A. SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56. The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The substantive law identifies which specific facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59,

---

**7.** As of April 12, 2001, the estimated cost of the project was $111,117,000 (EA p. 61).

**8.** On June 12, 2000, ODOT issued a "Notice of Availability" of a preliminary version of the

EA. The final EA, issued November 27, 2000, purports to have considered comments regarding the graft EA and "formulated appropriate responses." (EA p. iv).

90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

## B. NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURES ACT

Administrative actions, such as FHWA's instant Finding of No Significant Impact, are subject to review in this Court by virtue of the Administrative Procedures Act, 5 U.S.C. § 704. Pursuant to this statute, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed; and hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1) and (2)(a); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 972 (10th Cir.1992). An agency decision will be found "arbitrary and capricious" and set aside if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ Accordingly, the standard of review of agency determinations, such as the one presently at the bar, is a narrow one. Agency action is to be afforded a presumption of regularity, and a reviewing court must not "substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. 814; *see also, Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981). Instead, the Court must look for a "rational connection between the facts found and the choice made" and "consider whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error in judgment." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. 2856 (citation and quotations omitted). Thus, so long as an agency complies with the procedure mandated by the relevant statutes, and the record supports the choice made, this Court must afford the agency's decision "substantial deference." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Stated another way,

[E]xecutive agencies are empowered under NEPA to exercise discretion within the parameters established by Congress; this Court decides only whether the proposed action falls within such parameters, not whether the decision is sound public policy. *Coalition Against Superfluous Highways v. Wykle*, No 2:00–CV–429 (S.D. Ohio June 12, 2001).

Additionally, in determining the propriety of an agency action, the Court should critically examine proffered "post-hoc rationalizations" of the challenged decision, and instead base its decision upon a review of the contemporaneously-created administrative record, which has, in this matter, been filed with the Court. *Overton Park*, 401 U.S. at 419–20, 91 S.Ct. 814 (citing *Burlington Truck Lines v. United States*,

371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

■ Finally, the plaintiffs, as challengers of the instant decision, bear the burden of proving that the agency's action was in error. *Rosebud Sioux Tribe v. Gover,* 104 F.Supp.2d 1194, 1207 (D.S.D.2000); *Township of Belleville v. Federal Transit Admin.,* 30 F.Supp.2d 782, 801 (D.N.J.1998); *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. 1556, 1565–66 (S.D.Ala. 1996).

### III. LAW & ANALYSIS

The National Environmental Policy Act ("NEPA") requires a federal agency to prepare an Environmental Impact Statement ("EIS") [9] prior to any "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether a particular action will "significantly affect[ ] the quality of the human environment," thereby necessitating an EIS, the agency must first prepare, or cause to be prepared, an Environmental Assessment ("EA").[10] 40 C.F.R. § 1501.4; *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir.2000). If the agency determines, based on the EA, that the project will not create a "significant impact," the agency may issue a Finding of No Significant Impact ("FONSI") and no further environmental analysis is required. 40 C.F.R. 1501.4(e); *Metcalf,* 214 F.3d at 1142. If,

on the other hand, the agency determines that the proposal will create a significant impact, the agency must then complete an EIS. A federal agency's issuance of a FONSI constitutes a "final agency action," which is subject to review pursuant to the Administrative Procedures Act, 5 U.S.C. § 704, as outlined above.

The Plaintiffs take issue with FHWA's issuance of a Finding of No Significant Impact and the resultant decision to not require the preparation of an Environmental Impact Statement. Specifically, they point to four purported errors—both procedural and substantive—in the agency's resolution. First, they contend that agency regulations require the preparation of an Environmental Impact Statement in projects such as the one presently at the bar. Second, they argue that ODOT's purported violation of timing rules, and the resulting conflict of interest, impermissibly tainted the entire Environmental Assessment process so that the final document constitutes little more than a post-hoc rationalization of the predetermined "preferred route". Third, they aver that the agency improperly segmented the project so as to avoid the preparation of the full-scale environmental investigation. Finally, they state that the Environmental Assessment, prepared by ODOT, is substantively deficient and could not (or should not) have formed the basis for FHWA's Find-

---

**9.** An EIS is:

 a detailed statement by the responsible official on—
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C).

**10.** An EA is:
 [A] concise public document ... that serves to:
 (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. 40 C.F.R. § 1508.9(a).

ing of No Significant Impact. The Court will address each contention in turn.

## A. PURPORTED PROCEDURAL VIOLATIONS

The National Environmental Policy Act, "while establishing 'significant substantive goals for the Nation,' imposes upon agencies duties that are 'essentially procedural'." *Strycker's Bay,* 444 U.S. at 227, 100 S.Ct. 497 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). The plaintiffs have cited three purported "procedural" violations by the defendants. The Court will briefly address each.

### 1. Purported Violation of 23 C.F.R. § 771.115(a)(1) and (2)

As an initial matter, the plaintiffs argue that agency regulations provide that all projects such as the instant proposal to relocate U.S. 30 require the preparation of a full-scale Environmental Impact Statement. Therefore, the defendants' refusal to prepare an EIS is necessarily violative of the regulations. Specifically, the plaintiff's point to 23 C.F.R. § 771.115(a)(1) and (2), which provides, *inter alia:*

> (a) . . . Actions that significantly affect the environment require an EIS (40 C.F.R. 1508.27). The following are examples of actions that normally require an EIS:
>
> (1) A new controlled access freeway.
>
> (2) A highway project of four or more lanes on a new location.
>
> . . .

The Plaintiffs argue that the instant project "clearly falls under both (1) and (2)" as "[t]he EA and FONSI contemplate a four-lane, limited access highway of over 16 miles." (Plaintiffs' Motion for Summary Judgment p. 10). This being so, they argue that no EA was even necessary, as the agency itself *presumed a significant impact* and, by issuing the regulation, actually mandated the preparation of an EIS (Plaintiffs' Motion for Summary Judgment

p. 10). To bolster this argument, the plaintiffs point to a 1992 letter from FHWA to ODOT, which indicates that the federal agency believed that the U.S. 30 improvement "appear[ed] to be of the magnitude and type that would require an EIS" (Plaintiffs' Motion for Summary Judgment p. 24; AR021569), and remind the Court that McCoy/Fok was retained to prepare an EIS, rather than an EA. (AR003678; AR004889).

The defendants counter by arguing that the regulation utilizes the word "normally," which implies that "an EIS is not *always* required for such projects." (Defendants' Motion for Summary Judgment p. 26). The Court agrees.

 NEPA requires the preparation of an EIS only when significant environmental impacts are implicated by a proposal. The regulation cited by plaintiffs supports this contention by employing the word "normally," which implies that there are occasions when a FONSI may properly be issued. Thus, the mere fact that the project may be deemed a "highway project of four or more lanes on a new location" is not dispositive. Instead, the Court must examine the agency's decision and determine whether or not the defendants took the requisite "hard look" at the proposal's impact on the environment. *Coalition Against Superfluous Highways,* Case No. 2:00–CV–429 at 9;*Committee to Preserve Boomer Lake Park v. Dept. of Transportation,* 4 F.3d 1543, 1555 (10th Cir.1993); *Lakes Region Legal Defense Fund v. Slater,* 986 F.Supp. 1169, 1198 (N.D.Iowa 1997); *cf, Township of Belleville,* 30 F.Supp.2d at 797–98 (citing 23 C.F.R. § 771.115(c), which requires an Environmental Assessment when the proposal is one "in which the significance of the environmental impact is not clearly established" in order to determine "the appropriate environmental document required"). Moreover, the Court finds that the agen-

cy's belief, articulated several years prior to the completion of the instant environmental report, is insufficient to mandate an otherwise unnecessary EIS.

Accordingly, the Court finds that the plaintiffs' first argument is not well taken.

### 2. "Timing Rule" Violations and Conflicts of Interest

On February 11, 2000, over a year prior to the issuance of the FONSI, the plaintiffs wrote a letter to the Divisional Administrator of FHWA, and informed the agency that the second McCoy/Fok contract violated the applicable federal timing regulations. (AR000380). FHWA responded by stating that, as the design work was financed solely by ODOT, FHWA "intended to continue working with ODOT and its consultant and to approve the EA if we find it to be satisfactory." (AR011250). As in their February 2000 letter, the plaintiffs here argue that the second McCoy/Fok contract, executed and partially performed prior to the issuance of a FONSI, violated the applicable NEPA timing regulations, created a conflict of interest,[11] and seriously undermined the reliability of the resulting environmental document. (Plaintiffs' Motion for Summary Judgment p. 19). They further reason that because this was so, the EA and resulting FONSI were issued simply "to justify the alternative it had been expending considerable sums in designing." (*Id.* p. 21).

The defendants respond by simply stating that the FONSI, the ultimate agency action here subject to review, was issued by FHWA after a full and objective review of the preceding ten years of environmental analysis. Because McCoy/Fok's design work was financed solely by the state, the state alone bore the risk that a FONSI

would not issue, and only upon issuance of the FONSI did the *federal* agency become irretrievably committed to the project.

Federal regulations provide rules for the proper timing of projects such as the one at the bar. Specifically, 40 C.F.R. § 1506.1 and 23 C.F.R. § 771.113 provide, *inter alia:*

(a) Until an agency issues a record of decision ..., no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

...

(a) The [Federal Highway] Administration in cooperation with the applicant will perform the work necessary to complete a FONSI or an EIS and comply with other related environmental laws and regulations to the maximum extent possible during the NEPA process.... However, final design activities, property acquisition ..., purchase of construction materials or rolling stock, or project construction shall not proceed until the following have been completed:

(1)(i) The action has been classified as a categorical exclusion (CE), or

(ii) A FONSI has been approved, or

(iii) A final EIS has been approved and available for the proscribed period of time and a record of decision has been signed.

...

Additionally, the regulations provide that a federal agency may delegate the responsibility of preparing an environmental document to a state-level "applicant," provided that the federal agency "make[s] its own evaluation of the environmental issues and take responsibility for the scope and con-

---

11. Essentially the plaintiffs argue that the second McCoy/Fok contract for engineering and design work created an incentive to chose a more work-intensive "preferred route" (i.e., the route through the Burkholders' farm) (Complaint ¶ 2).

tent of the environmental assessment." 40 C.F.R. § 1506.5(b). While a private contractor may be retained to perform this often highly technical work, the firm must first provide the federal agency with a "disclosure statement," which warrants that the contractor has no "financial or other interest in the outcome of the project." 40 C.F.R. § 1506.5(c).[12]

■ While mindful of the importance NEPA places on procedure, for the following reasons the Court disagrees with the plaintiffs' contention that the instant EA and FONSI must be discarded.

■ The goal of NEPA and its associated regulations is to assure that "agencies proposing to take any action that will affect the natural environment ... will take a 'hard look' at the environmental consequences." *Associations Working for Aurora's Residential Environment v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir.1998). Thus, when reviewing an allegation that a regulatory violation has undermined the validity of an environmental document, "the ultimate question for the court is ... whether the alleged breach has compromised the 'objectivity and integrity of the NEPA process.'" *Id;* *see also, Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C.Cir.1991); 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent

paperwork—but to foster excellent action."); 40 C.F.R. § 1500.3 ("...it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action."). Moreover, because NEPA presumes that a federal agency is predisposed to favor a proposed action, a showing of such predisposition alone is insufficient to invalidate an agency's decision. *Metcalf,* 214 F.3d at 1142 (citing *Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army,* 470 F.2d 289, 295 (8th Cir.1972)).

In the instant matter, the Court concludes that any violation of the above cited rules, and any resulting conflict of interest, was *de minimus* and cured by the federal agency's independent oversight. Furthermore, the Court finds that Ohio's expenditure, prior to FHWA's issuance of the FONSI, did not prematurely commit any federal resources.

ODOT, not FHWA, prematurely engaged McCoy/Fok and financed the final design work about which the plaintiffs complain. As a result, ODOT alone bore the risk that the EA and the "preferred alternative" it suggested would be rejected by the federal agency. Thus, there is nothing to rebut the presumption of regularity and no reason to presume that the federal decision-maker was influenced by the state's expenditure.[13] *See North Car-*

---

**12.** The Council on Environmental Quality ("CEQ") has interpreted "financial or other interest" to include:

> ... known benefits other than enhancement of professional reputation. This includes any financial benefit such as a promise of future construction or design work on the project.... If a consulting firm is aware that it has such an interest in the decision of the proposal, it should be disqualified from preparing the EIS, to preserve the objectivity and integrity of the NEPA process. 46 F.R. 18031. While the Court looks to the Council's statement for guidance, it is not entitled the same weight due

administrative rules, which are the product of notice and comment procedures. *Associations Working for Aurora's Residential Environment v. Colorado Dep't of Transp.,* 153 F.3d 1122, 1127 (10th Cir.1998) (citing *Northern Crawfish Frog (Rana Areolata Circulosa) v. FHWA,* 858 F.Supp. 1503, 1527 (D.Kan.1994)).

**13.** Additionally, the Court finds that it is highly unlikely that the purported conflict of interest caused the defendants (either state or federal) to choose a route through the plaintiffs' property. The "preferred route" was chosen a year prior to the challenged contract and after four years of environmental review.

*olina v. City of Virginia Beach,* 951 F.2d 596, 602–03 (4th Cir.1991); *Overton Park,* 401 U.S. at 415, 91 S.Ct. 814 (finding that an agency's decision "is entitled to a presumption of regularity"). Furthermore, upon review of the record, it is clear to this Court that any actual conflict of interest was trivial, and sufficiently circumscribed by the federal agency's oversight. *See Associations Working for Aurora's Residential Environment,* 153 F.3d at 1129 (holding that a court may consider the facts surrounding a purported conflict of interest and determine whether agency oversight cures the purported conflict).

Finally, as no *federal* funds or obligations were committed to the project until after the FONSI's issuance, the Court cannot find that the agency "irretrievably" or "irreversibly" committed any federal resources prior to rendering its decision.[14] *Metcalf,* 214 F.3d at 1143 (finding that NEPA requires that the procedure be completed prior to "any irreversible and irretrievable commitment of resources").

While these procedural requirements are not mere technicalities, the plaintiffs here have pointed to no evidence that shows that FHWA's decision was actually (or even impliedly) influenced by the state's prior commitment, and no evidence that the federal agency did not objectively review the submitted EA. As a result, the Court finds that these technical deviations did not impair the agency decision-maker's ability to adequately review the environ-mental facts and, as a result, the Court can find no cognizable harm. *See Sierra Club v. Marsh,* 714 F.Supp. 539, 583 (D.Maine 1989); *Cf Citizens Against Burlington,* 938 F.2d at 202 (opting not to invalidate an EIS, despite finding procedural violations).

Irrespective of the foregoing, the plaintiffs also argue that FHWA had an obligation to police and curb ODOT's pre-FONSI expenditures and commitments. Specifically, the plaintiffs cite 40 C.F.R. § 1506.1(b), which provides:

> If any agency is considering an application from a non-federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would [have an adverse environmental impact; or limit the choice of reasonable alternatives], then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved.

The Court finds that design work, such as that performed here, does not "have an adverse environmental impact," *City of South Pasadena v. Slater,* 56 F.Supp.2d 1106, 1147 (C.D.Cal.1999), and, as it was begun solely at the state's risk, did not limit FHWA's "choice of reasonable alternatives." *See City of Virginia Beach,* 951 F.2d at 602–03. Moreover, in light of the circumstances addressed above, the Court finds that the agency's decision to independently review the ODOT-prepared environmental document, while bearing in

---

Moreover, the Court finds that the purported promise of future work, contained in the first McCoy/Fok contract, is too equivocal to have bound the state to further engage the contractor for final design work.

14. It bears repetition that McCoy/Fok was retained to begin engineering work after over four years of environmental analysis, public comment, and inter-agency coordination. In so noting, the Court contrasts this case with the circumstances at issue in *Metcalf v. Daley,* 214 F.3d 1135 (9th Cir.2000). In that case, the federal agency committed itself, in 1996, to support a Native American tribe's application for a whaling permit and agreed to cooperate with the tribe in managing the harvest of whales. *Id.* at 1139. In June 1997, a would-be plaintiff informed the agency that he believed that the agency's commitment violated NEPA; within four months of this letter, the agency had prepared an EA and issued a FONSI. Perhaps not surprisingly, the court found that the EA and FONSI there were issued merely to justify a decision that had already been made.

mind the plaintiffs' concerns about a possible conflict of interest, was an "appropriate" response to the situation.

Finally, the Court cannot fathom what benefit, other than mere delay, the plaintiffs would derive from requiring the defendants to prepare a new EA, when, as discussed below, they have not shown that the agency did not take the required "hard look" at the project's environmental impacts. *See Metcalf,* 214 F.3d at 1150 (Klienfeld, J. dissenting) (discussing *Realty Income Trust v. Eckerd,* 564 F.2d 447, 458 (D.C.Cir.1977)). Accordingly, the Court finds that the plaintiffs' arguments in this regard are not well taken.

### 3. Improper Segmentation

"Segmentation" or "piecemealing" is "an attempt by an agency to divide artificially a 'major federal action' into smaller components to escape the application of NEPA to some of its segments." *Save Barton Creek Assoc. v. FHWA,* 950 F.2d 1129, 1140 (5th Cir.1992), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *see also, Wetlands Action Network v. United States Army Corps of Engineers,* 222 F.3d 1105, 1118 (9th Cir.2000). The plaintiffs argue that, as the instant project is part of a state-wide plan to upgrade all of U.S. 30, the impacts of the entire project (i.e. the 242 miles of high-

way that stretch across Northern Ohio) should have been considered in an EIS. (Plaintiffs' Motion for Summary Judgment p. 29; Plaintiffs' Memorandum Contra p. 25).[15] The Court again disagrees.

When undertaking an analysis of a larger project's alleged improper segmentation, the Court must "weed out projects which are pretextually segmented, and for which there is no independent reason to exist." *Save Barton Creek,* 950 F.2d at 1139. In analyzing the propriety of a segmented project, the Court must consider

… whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects. *Id.* at 1140.[16]

 Being ever mindful of the appropriate standard of review, the Court finds that the proposed upgrade of 16.31 miles of highway is not an improper segment of a larger project and not an attempt to evade environmental review. First, the Court finds that the previously upgraded bypasses on either end of the project area clearly constitute "logical termini" [17] of the instant proposal. Second, the Court finds that, by re-routing the heavy, truck traffic and thereby increasing the level of service

**15.** The exact contours of the plaintiffs' argument concerning improper segmentation are unclear. Their reliance upon the holding of *Save Barton Creek Ass'n v. FHWA,* 950 F.2d 1129 (5th Cir.1992), suggests that they are asserting that the agencies here have improperly divided a massive project into a several "insignificant" ones so as to evade the compilation of an EIS, yet the bulk of their argument, however, focuses on the agencies' refusal to adopt the plaintiffs' preferred route.

**16.** Agency regulations set forth a similar standard:

(f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or [FONSI] shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. 23 C.F.R. § 771.111(f).

**17.** "Logical termini" include "major crossroads, population centers, major traffic generators, or similar highway control generators." *Conservation Law Foundation v. FHWA,* 827 F.Supp. 871, 878 (D.R.I.1993) (citing 37 Fed. Reg. 21,810).

and safety of the route, the project has utility, independent of the completion of any of the other six unimproved segments of US 30. *Id.* at 1141–42; *Coalition Against Superfluous Highways,* 2:00–CV–429 at 16–17; *Conservation Law Foundation v. FHWA,* 827 F.Supp. 871, 879 (D.R.I.1993). Also, while noting that construction of a road necessarily limits the practicality of related projects, the Court finds that this project is not a "road to nowhere," and does not "effectively commit decisionmakers to a future course of action." *Conservation Law Foundation,* 827 F.Supp. at 880 (quoting *Coalition for Sensible Transp. v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987)). This being so, the improvement of the 16.31 mile segment does not unreasonably foreclose the opportunity to consider alternatives for the improvement of other sections of U.S. 30 or other related projects, and does not irretrievably commit federal funds to future development. *Id.*

Accordingly, the Court finds that the project has not been artificially segmented in order to evade environmental review and rejects the plaintiffs' contention that the defendants behaved arbitrarily or capriciously in this regard.[18]

### B. ADEQUACY OF THE ENVIRONMENTAL ASSESSMENT

In addition to the aforementioned alleged procedural violations, the plaintiffs also argue that the defendants' determination that no significant environmental impacts were implicated by the project is incorrect and must be discarded. In light of the administrative record and appropriate standard of review, the Court disagrees.

In determining the "significance" of a proposed federal action, the agency must consider the "context" and "intensity" of the proposal's potential impacts. 40 C.F.R. § 1508.27;[19] *Winchester Coalition*

---

18. Moreover, the Court doubts that the Ohio Department of Transportation would (or could) secretly coordinate the activities of numerous state and federal agencies, for a period in excess of thirty years, simply to avoid having to prepare an EIS. The defendants also cite *Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976), for the proposition that comprehensive environmental review of a *state's* long-range transportation plans is not required. Because it is unnecessary to reach this issue, the Court neither rejects or accepts the argument as applied to the facts of the present controversy.

19. Specifically, the regulation reads:
*Significantly* as used in NEPA requires considerations of both context and intensity:
(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action....
(b) *Intensity.* This refers to the severity of impact.... The following should be considered in evaluation of intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts....
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for

*for Responsible Dev. v. U.S. Dep't of Housing and Urban Dev.*, 999 F.Supp. 1058, 1065 (S.D.Ohio 1998). In suits such as this one, which challenge an agency's issuance of a FONSI, the reviewing Court must ensure that, in preparing and/or reviewing the EA, the agency took a "hard look" at all the relevant foreseeable consequences of a proposed action, in light of their context and intensity, and determined that no "significant impact" to the environment would result. *Metcalf*, 214 F.3d at 1141 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). In order to pass muster upon review,

> "the comprehensive 'hard look' mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.2000).

It is worth repetition, however, to note that an agency's issuance of a FONSI is entitled to "substantial deference," *Oregon Natural Resources Council*, 490 U.S. at 372, 109 S.Ct. 1851, and will only be overturned if "arbitrary, capricious, or an abuse of discretion." *Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir.1997). Thus, if the agency has taken the required objective "hard look," the Court will not substitute its judgment for that of the agency. *Committee to Preserve Boomer Lake Park*, 4 F.3d at 1551.

 Additionally, the Court notes that it is not in a position to decide between

differing experts and competing methodologies, and a disagreement among experts is insufficient to invalidate an environmental decision. *Id.* at 1553 (citing *Arizona Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1428 (9th Cir.1983)). Instead, the Court must limit its scientific and/or technical inquiry to determining whether a challenged methodology or technique has "a rational basis and took into account the relevant factors." *Id.* (citing *Druid Hills Civic Ass'n v. FHWA*, 772 F.2d 700, 711 (11th Cir.1985)).

FHWA's decision to issue a FONSI here was based upon the EA prepared by ODOT. Thus, the substantive adequacy of the document must be examined.

### 1. Consideration of Reasonable Alternatives

The unifying theme underlying the plaintiffs' allegation that the defendants inadequately considered alternatives to the preferred route is their assertion that the agencies should have more thoroughly considered (and ultimately adopted) a plan for an improved U.S. 30 that maintained the road's present alignment. In advancing this contention, the plaintiffs suggest two deficiencies with the EA. First, they aver that the stated purpose and need for the project is so narrowly drawn that only the preferred alternative would satisfy its criteria and that it renders any purported consideration of a plan to improve the existing roadway a sham. Second, regardless of the project's promulgated purpose statement, they contend that the defendants did not fully and meaningfully consider a "range of alternatives" for the

---

listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat. . . .

(10) Whether the action threatens a violation of Federal, State, or local law. . . . 40 C.F.R. § 1508.27

proposed action. The Court will briefly address each concern.

### a. The Project's "Purpose and Need"

The plaintiffs first take issue with the project's statement of "purpose and need" and the data upon which this statement was premised. Specifically, they allege that the project's stated justification was unreasonably restrictive, and, as such, impermissibly limited the "range of feasible alternatives" the agencies could consider. Furthermore, they aver that this stated justification was premised upon a faulty and over-optimistic prediction of the project's likely benefit to local traffic volume, safety and economic prosperity. (Plaintiffs' Motion for Summary Judgment pp. 35–40). The defendants counter by arguing that, in light of the undisputed deficiencies of the two-lane highway, the "purpose and need" are reasonable, and that the plaintiffs' concerns about the project's predicted benefits "reflect[ ] a fundamental misunderstanding of the data in the record and how traffic forecasts fully support one of the crucial needs addressed by the proposed road improvements." (Defendants' Brief in Opposition p. 6).

■ A project's statement of "purpose and need" is interrelated with an agency's evaluation of reasonable alternatives for the proposal. The regulations provide that the statement must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. In drafting this statement, however, "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environ-mentally benign ones ... would accomplish the goals of the agency's action, [thereby making the environmental review] a foreordained formality." *Citizens Against Burlington*, 938 F.2d at 196. An agency's determination of a project's stated goal, however, is one to which the Court must again show deference. *Id.*

As summarized in the FONSI in the case at the bar,

> The purpose and need for this improvement is based upon the level of service and local safety deficiencies identified on the existing two lane U.S. 30, the completion of the missing link of U.S. 30 to a four lane limited access facility [20] and for the projected regional and statewide economic benefit. (AR024239; *see also* EA pp. 1–6).

■ The Court finds that the stated purpose is not so "unreasonably narrow" that the environmental review and ultimate selection of a preferred route became a "foreordained formality." Instead, the record is clear that the defendants actively considered four different alternative routes, a "no build" alternative, and an improvement of the existing roadway, prior to settling on the preferred alignment. As such, the Court finds that the statement is not so narrow as to preclude meaningful discussion of alternatives and, as a result, meets the requirements of NEPA.

The Court also finds, contrary to the plaintiffs' protestations, that the project's stated justification is supported by sufficient data. In fact, the record is clear that the data, upon which the defendants relied, showed that the level of service on the present U.S. 30 was seriously deficient

---

**20.** The plaintiffs' objection to this purpose is interrelated to their allegation of "improper segmentation" discussed above. Provided that the project has not been "segmented" to avoid environmental review, and the Court has earlier held that it has not, the Court finds nothing untoward about the project's goal of providing "the missing link" to a desired trans-Ohio freeway.

(EA pp. 4–5 and Exhibit H; AR014053), that traffic could be expected to increase as it had during the previous decade(EA p. 4 and Exhibit H; AR022017; AR00354; AR020017), that the safety of the route was a significant concern of both the public and highway officials (EA pp. 6–7 and Exhibit H; AR009050; AR009052; AR016823; AR018511; AR022185; AR024130), and that the improvement would be economically beneficial (EA pp. 2–3 and Exhibit H; *Access Ohio* p. 125, §§ 3.1–3.8; AR012640; AR012914; AR013073; AR016872). Moreover, in light of the foregoing, the Court finds a factual basis for the defendants' conclusion that a limited-access, four-lane freeway would best solve the road's problems. While it is clear that the plaintiffs' expert has reached a different conclusion (AR021999), the Court must be wary of interposing itself in such a technical or methodological dispute. *Committee to Preserve Boomer Lake Park*, 4 F.3d at 1553. This being so, the Court finds that the defendants' projection of the improvement's benefits was not arbitrary and capricious and rejects the plaintiffs' contention in this regard.

### b. Consideration of a Range of Feasible Alternatives

The plaintiffs next allege that the defendants refused to consider all reasonable alternatives to the proposed action, and improperly rejected serious consideration of the "most obvious alternative": the improvement of US 30 along its present alignment. (Plaintiffs' Motion for Summary Judgment p. 31). While the plaintiffs concede that the EA does address such an upgrade, they allege that this alternative was "designed to fail." The defendants counter by stating that they did seriously consider the upgrade proposed by plaintiffs, but determined that the plaintiffs' alternative was not feasible as it would cause "excessive impacts" and would not meet the project's purpose and need.

(Defendants' Motion for Summary Judgment pp. 34–35).

Consideration of a range of alternatives for a proposed action must be the "heart" of the environmental document. 40 C.F.R. § 1502.14; *Associations Working for Aurora's Residential Environment*, 153 F.3d at 1130. This being so, the document must "[r]igorously explore and objectively evaluate all *reasonable* alternatives, and for the alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (emphasis added). An agency's determination of which alternatives are "reasonable," thereby warranting closer review, is subject to a "rule of reason and practicality," *Committee to Preserve Boomer Lake Park*, 4 F.3d at 1551, and "an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends." *Associations Working for Aurora's Residential Environment*, 153 F.3d at 1130 (citing *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992)); *see also Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir.1981) ("[T]his court may only inquire whether the [agency's] consideration of the [allegedly feasible alternative] was so inadequate as to be an abuse of discretion."). Additionally, when an agency has concluded, through the preparation of an EA, that a particular project will not have a significant impact, "the range of alternatives it must consider to satisfy NEPA is diminished." *Central South Dakota Cooperative Grazing Dist. v. Secretary of the U.S. Dep't of Agriculture*, 266 F.3d 889, 897 (8th Cir.2001); *Coalition Against Superfluous Highways*, 2:00–CV–429 at 18 (citing *Hoosier Environmental Council, Inc. v. U.S. Army Corps of Engineers*, 105 F.Supp.2d 953, 999 (S.D.Ind. 2000)).

■ The Court must not substitute its judgment for that of the agency. *Associations Working for Aurora's Residential Environment,* 153 F.3d at 1130. Bearing this in mind and upon review of the EA and the administrative record, the Court finds that the defendants did consider the feasibility of improving the existing road, but found that smaller scale improvements (so-called "Transportation System Management" measures) would not meet the project's stated objectives and that more significant improvement (e.g. widening the road and reducing access) would cause more environmental impacts than any of the re-routing alternatives. This conclusion and its bases is contained in the EA, which provides:

> The alternative of using Transportation System Management (TSM) measures, which are essentially smaller scale improvements or activities to optimize the efficiency of the existing highway within the project area, are not appropriate for this project and do not meet the project purpose and need. TSM alternatives would not provide for improved access, safety, level of service, nor opportunity for economic development.
>
> . . .
>
> Upgrading the existing facility to either a four-lane freeway with controlled access interchanges or widening the existing [sic.] to four lanes while *"maintaining full access"* is considered not feasible nor prudent due to the excessive impacts that would result.
>
> . . .
>
> [L]ocal and regional economic development would be degraded rather than

enhanced. Many small businesses, large commercial facilities, cemeteries, churches, residences and other entities lie along the existing Route 30 corridor and would be subject to excessive impact.[21] Loss of property would render many establishments inoperable. Displacements of both commercial, industrial, and residential properties would be substantial and non-conducive to area growth and prosperity. (EA pp. 16, 18 (emphasis in original); *see also* Exhibit H, pp. 16–20).[22]

The Court finds, therefore, that the defendants considered, but ultimately rejected the plaintiffs' proposal and that the stated reasons sufficiently justify their decision. *See e.g. Committee to Preserve Boomer Lake Park,* 4 F.3d at 1550 ("The inability of an alternative to accommodate future traffic volumes is justification for rejecting that alternative."). This being so, the Court finds that the defendants have considered the "reasonable" alternatives and holds that the plaintiffs' argument is not well taken. *See Coalition Against Superfluous Highways,* 2:00–CV–429 at 18–19 ("An agency that has considered, but has not adopted, an alternative course of action has not acted in an arbitrary and capricious manner.").

### 2. Significance of the Environmental Impacts

The plaintiffs also claim that the defendants did not take the required "hard look" at many of the impacts of the proposed project. Specifically, they argue that the agencies inadequately considered

---

**21.** Specifically, the EA indicates that 382 homes, two apartment buildings, one nursing home, two house trailers, one trailer park, sixteen farms, numerous businesses, four factories, utilities, and various other properties would be impacted by expanding U.S. 30 along its present alignment (EA p. 17; *see also* AR024074).

**22.** The Court further finds that this statement meets the requirements of 40 C.F.R. § 1502.14(a), which merely requires that the environmental document "briefly discuss the reasons for [the alternatives] having been eliminated" from detailed study.

the project's impacts on the area's soil, water resources, and historical value, and ignored the project's indirect impacts on the safety of adjoining roads. The defendants respond by stating that they considered the "context" and "intensity" of the project and gave the relevant, potential environmental, historical and cultural impacts the requisite "hard look." The Court will consider each allegation in turn.

### a. Soil Conditions' Effects on Wells and Other Sources of Potable Water

The plaintiffs contend that the preferred alternative will traverse several glacial kames (an area of "highly permeable" soil), which, in turn, will create an increased risk of surface and ground water contamination in the event of a "catastrophic ... truck spill of hazardous materials,[23] road runoff and road maintenance activities." (Plaintiffs' Motion for Summary Judgment p. 40–43; AR022090). They further contend that the defendants refused to acknowledge that an improvement of the present alignment of U.S. 30 would "provide greater protection for surface and ground water" than any of the alternatives considered, and that the agencies' determination that the area did not meet the requirements of a "sole-source aquifer"[24] was simply incorrect. (Plaintiffs' Motion for Summary Judgment p. 40; AR022090).

The defendants counter by stating that they did, in fact, consider the impacts on surface and subsurface water, but that plaintiffs merely disagree with their conclusions. In support of this argument, the agencies point to EA's discussion of the project's impacts on wetlands (EA p. 21; EA Table 3)and ground water resources (EA p. 25; EA Appendix H p. 20–23), and the "Ecological Resource Survey" (AR021148) and "Ecological Survey Report" (AR002198) contained in the Administrative Record. Additionally, the agencies point out that the Ohio Department of Natural Resources twice opined that the project did not implicate any unique hydrological or other environmental issues (AR013062; AR021122) and that the hydrological expert ODOT retained specifically to evaluate the plaintiffs' concerns reached the opposite conclusion regarding the hydrogeologic risks associated with both the proposed and existing alignments. (AR022876). Specifically, after reviewing the plaintiffs' objections, the relevant literature, numerous maps, and 525 "well completion logs," the defendants' expert found:

> The data do not support [plaintiffs'] contention that the existing alignment is located in an area characterized as having soils that are "less permeable". We conclude the data indicate that soil infiltration beneath the existing and proposed alignments is comparable. In fact, soil types which have an infiltration rate characterized as "rapid" comprise 6.2% (1.45 kilometers) of the total traverse length of the *existing* alignment, but comprise only 2.8% (0.73 kilometers) of the total traverse length of the *proposed* alignment.[25]
>
> Both alignments cross areas underlain by relatively shallow aquifers which are

---

23. The Court wonders how the plaintiffs can conclude that the feared "catastrophic" spill of hazardous material would have *less* of a detrimental effect if it were to occur along the more-populated existing alignment.

24. A "sole-source aquifer" may be entitled to additional environmental protection under the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq..*

25. While not finding the FONSI improper, the Court notes that the instant project is not really an either/or proposition in that, upon the completion of the 16.31 mile freeway, *both* the existing alignment and the proposed alignment will be traversed by pavement.

used extensively by domestic wells. However, the proposed alignment traverses approximately 2.8 fewer kilometers of these areas than the existing alignment. As a result, it is believed that the proposed alignment, while not completely eliminating the risk for potential groundwater contamination in sensitive areas of shallow groundwater, is preferred over the existing alignment in terms of overall protection of groundwater quality (AR022885) (emphasis in original).

■ In reviewing the administrative record and EA, the Court cannot conclude that the defendants did not take a "hard look" at the area's soil conditions and the effect that the proposed route would have on the area's hydrological resources and, because this conclusion rests upon "a rational basis and [takes] into account the relevant factors," the Court will not become an arbiter of competing scientific methodologies. *Committee to Preserve Boomer Lake Park*, 4 F.3d at 1553. Accordingly, in light of the appropriate standard of review, the Court concludes that the agencies sufficiently considered the project's impacts in this regard.

### b. The Project Area's Historic and/or Cultural Value

While not articulated as an independent reason to invalidate the EA and FONSI, the plaintiffs also repeatedly state that the defendants improperly refuse to acknowledge the prehistoric, historic and cultural significance of the project area and their "Civil War era home, barn and corn crib." (Complaint ¶¶ 1, 4 and 8; Plaintiffs' Motion for Summary Judgment p. 2, 9).

The defendants maintain that an extensive review of the area's archeological and historical significance was undertaken and that the eligibility of the plaintiffs' property for inclusion on the National Register of Historic Places ("NRHP") was specifically considered. This being so, they argue that the site's archeological, historic and cultural significance received the appropriate "hard look," and that the agencies' conclusion that no significant impact resulted is supported by the record.

■ The Court agrees that the defendants' contentions are supported by the administrative record. The EA indicates that the defendants reviewed the relevant literature and secondary sources and determined that the area contained 121 previously-documented prehistoric and historic archeological sites (EA p. 26). It indicates that field work was undertaken and a total of 671 sites were identified, 41 of which were identified as potentially eligible for inclusion on the NRHP (EA p. 27; AR019764). Once a preferred alternative was selected, ODOT determined that the route could potentially impact seven of these sites (EA p. 27) and commissioned a "Phase II Site Evaluation" to further analyze the road's impact. Based upon the study's findings, ODOT determined that none of the sites were eligible for inclusion on the NRHP (EA p. 27; AR000478).

While ODOT researched the area's archeological significance, the agency contemporaneously conducted a survey of the area's historic architecture, and identified 131 buildings that were over fifty years old and required further historical analysis. (EA p. 28). After further review and coordination between ODOT and the Ohio Historical Preservation Office, it was determined that only eleven historically significant properties were impacted by the preferred alternative, and the preferred alternative would not require the destruction of any of the historically significant structures. (EA p. 28–29). As a result, ODOT concluded that the project "will af-

fect no historic properties ..."(EA p. 29).[26] *See* 36 C.F.R. § 800.4(d)(1).

Despite the plaintiffs' apparent belief to the contrary (AR022133), the Ohio Historical Preservation Office has repeatedly opined that the their property was ineligible for listing on the NRHP and that the project area lacked significant archeological import. (AR000139;[27] AR021992; AR021989). Accordingly, in light of the appropriate standard of review, the Court finds that the defendants took the required "hard look" at the project's archeological, historical and cultural impacts and their conclusion that no significant impact would result is not arbitrary and capricious.

### c. Indirect Impacts

Finally, the plaintiffs state that "the EA does not evaluate the [indirect] impacts of changing traffic patterns in local communities that would be expected to result from the preferred alternative." (Plaintiffs' Memorandum Contra p. 16). The defendants, on the other hand, maintain that "ODOT expressly addressed safety hazards on access roads" and concluded that "traffic impacts to [access roads] as a result of the proposed facility would be considered minor." (Defendants' Motion for Summary Judgment pp. 19–20).

 The Court finds support for the defendants' position in the record and in the EA itself. Specifically, the Court finds

that the defendants considered the project's effect on "area traffic patterns and local businesses" and analyzed the new, limited access freeway's interchanges. (EA pp. 40–43; AR003544). Moreover, the Court notes that one of the project's *specific purposes* is to alleviate traffic congestion and improve traffic safety and volume along the area's highways and byways (EA pp. 4–7). This being so, the Court is compelled to find that the defendants have, in fact, specifically taken these impacts into consideration and that their decision in this regard was not arbitrary and capricious.

### C. THE AGENCY'S CONCLUSION: FONSI

In light of the foregoing, and being unable to formulate any additional reason to invalidate the EA, the Court hereby concludes that FHWA's consideration of, and reliance upon the EA was not improper. This being so, the Court further finds that the federal agency properly considered the "context" and "intensity" of the proposed project, gave all would-be impacts the appropriate "hard look," and did not arbitrarily or capriciously decide to issue the Finding of No Significant Impact.[28]

## IV CONCLUSION

Based on the foregoing, the Court hereby DENIES the Plaintiffs' Motion for Summary Judgment (Docket No. 23) and

---

26. While the Ohio Historical Preservation Office did not specifically concur with ODOT's conclusion, it also did not object (AR000055). Under the circumstances, such acquiescence constitutes approval of the defendants' conclusion. 36 C.F.R § 800.4(d)(1).

27. In a letter, dated August 9, 1996, the Ohio Historical Preservation Office writes,
[Plaintiffs' farm], CRA–9–14, is not eligible for inclusion in the National Register of

Historic Places and we concur that the archeological sites in this area do not compromise an historic district. We feel that the identification efforts in this part of the project have been thorough and comprehensive.

28. The Court also finds that the FONSI meets all of the formal requirements of 40 C.F.R. § 1508.13.

GRANTS the Defendants' Cross–Motion for Summary Judgment (Docket No. 21).

IT IS SO ORDERED.